THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EARL WILSON, Defendant-Appellant.

First District (6th Division) No. 1—88—0105

Opinion filed April 16, 1990.

1000

Sam Adam and Marc W. Martin, both of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and Bonnie Meyer Sloan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

A jury found defendant, Earl Wilson, guilty of two murders, and the trial court sentenced him to a term of natural life imprisonment without parole. Defendant appeals, contending that certain evidence should have been suppressed as the fruit of illegal eavesdropping and the fruit of evidence seized without a warrant or probable cause; that defendant's confession was not voluntary and was obtained in violation of his right to counsel; that no probable cause existed to arrest defendant for murder; that the trial court unduly belittled defense counsel in front of the jury; that the admission of photographs of the crime scene and of the victims prejudiced defendant; that hearsay testimony concerning a mobile telephone conversation between defendant and another man setting up the murders, which was overheard by an anonymous informant, was improperly permitted; that the mug shot of defendant's accomplice was improperly used; that defendant and his ex-wife were improperly impeached with prior convictions; and that the cumulative effect of any errors requires reversal.

On November 18, 1986, just after midnight, Willie "Flukey" Stokes, a major Chicago drug dealer, and Ronald Johnson, his chauffeur, were shot and killed while sitting in Stokes' car with Diane Miller. Defendant claimed he witnessed the shooting. When the police arrived, defendant's car was stopped behind Stokes' car, and defendant was standing by the bodies, waving a gun, shouting that he was the bodyguard and the assailants had escaped.

Defendant was arrested at the scene for unlawful use of a weapon and firing a weapon within the city limits. He was subsequently released on bond. His mobile telephone was seized from his car by the police.

On November 18 and 19, 1986, an anonymous informant telephoned the police and reported that on November 18 shortly after midnight, he overheard two mobile telephone conversations describing the route two cars were taking on the south side of Chicago, and the exact arrival time and location of their destination, so that a crime could take place upon their arrival.

On November 21, 1986, the police obtained the telephone records for the mobile telephone in defendant's car. The records indicated he made two telephone calls just after midnight on the night of the murders, to a telephone registered to Elliot Taylor, another major drug dealer on the south side.

On November 24, 1986, the police arrested defendant for the murders.

Defendant moved to suppress evidence resulting from the seizure of his car telephone, to quash his arrest and suppress his confessions, and to suppress evidence regarding an anonymous informant's report that he heard telephone calls.

At the hearing, defendant testified regarding what occurred when the police arrived at the scene of the shooting, near 79th and Ellis. He pulled up behind the victims' black Cadillac when several men came up to the black car and began shooting. Defendant fired about five shots at the assailants. None of the assailants shot back at defendant. They were not paying any attention to him. He stood about two car lengths away from the assailants. He believed that he hit one person because he saw the man spin and heard him say that he was hit. When the men ran away, defendant went over to Stokes' car. He left his own car double parked behind Stokes' car, with the engine running. He saw that Stokes and Johnson had been shot and were in the front seat of Stokes' car. Miller was lying unharmed in the back seat of the car.

Defendant testified that when the police arrived, he was standing next to Stokes' car, holding a gun in his hand. Defendant was trying to keep passersby away from the car. The police told defendant to drop his weapon. Defendant explained that he was Stokes' bodyguard and that the offenders had run south on Ellis. The police handcuffed defendant and put him in the squad car. Prior to the shootings, the only telephone calls he made that night on his mobile telephone were to his ex-wife and to his girl friend.

At the same hearing, Officer Elmer Atkinson testified that he and another officer were the first to arrive at the scene of the shooting. He saw the two Cadillacs facing southbound on Ellis. Defendant was standing near the black Cadillac, waving a gun in his hand. Atkinson drew his weapon, exited the car, and ordered defendant to drop the gun. Defendant said he was the bodyguard and that the assailants had run south on Ellis. Atkinson again shouted his order, and defendant finally threw down the gun. Defendant described the occurrence. Upon emptying defendant's gun, Atkinson found four expended shells.

Atkinson then accompanied the watch commander, walking south-

bound on Ellis, and examined all of the parked cars for any indication of gunfire. They also looked for blood trails, since defendant stated he thought he shot someone. They found nothing.

Lieutenant Phillip Cline testified at the hearing that he arrived at the scene within an hour after the shooting occurred. He was told what defendant had reported to the police and later received the same report from defendant. Cline had two officers check all the buildings and cars on the block. They could find no bullet holes. There were no blood trails, and no injury to defendant or his car.

Cline spoke with Diane Miller. She reported that Stokes was cautious and purposely kept an irregular schedule. Cline then went to defendant's car and saw a portable telephone and some handwritten notes, which he took. Cline concluded from the information he had that Stokes "had been set up."

Cline subsequently subpoenaed the telephone records after he learned the number of defendant's mobile telephone. Cline discovered from the records that a call was made from defendant's mobile telephone shortly after midnight and lasted six minutes; a second call lasted 15 minutes and ended at 12:29 a.m. The calls were made to a mobile telephone registered to Elliot Taylor. Cline knew Taylor was involved in drug trafficking, and that defendant and Taylor grew up together. Defendant and Taylor had also been involved in several criminal activities together.

With regard to his motion to suppress evidence regarding an anonymous informant's report that he overheard a mobile telephone conversation on the night of the shooting, defendant testified at the hearing that on the night in question he telephoned his ex-wife several times. These calls were made from his mobile phone to her brother-in-law's mobile phone, which was registered to Elliot Taylor. Defendant expected that the conversations were private.

Cline testified that on November 18, Officer McWeeny talked to an anonymous caller about the overheard telephone calls. On November 19, Cline spoke with the same caller. Cline testified the caller said he had a scanner and that he overheard some mobile telephone conversations. Cline described it as a "running surveillance." The informant said "that one person was telling the other person where their position was at different parts of the city as they were driving." They stopped at a grocery store, then headed to the 7900 block of Ellis. The man on the phone said, "You better tell the boys not to run and you're going to need a bodyguard after this thing is over."

Larry Harris, director of operations and engineering of Cellular One, testified for the State at the hearing regarding the operation of

defendant's mobile telephone. Harris explained that when a mobile telephone caller dials a number, it is converted to a radio signal and transmitted to cell sites and broadcasted as a radio wave to the person receiving the call. A cell site consists of radio towers and bay stations which use radio wave transfer equipment. The radio signal used by the mobile telephones is an FM radio signal. Radio scanners, which are available to the general public, are capable of picking up the FM radio band. Any persons using the scanner on that frequency would hear the audio telephone conversation the same as if they were listening to a broadcast radio station. While some of this was explained in the company's user's manual, it did not explicitly say the conversations were not private because it was too negative and thus an unwise business practice.

The parties stipulated that Harris would also testify that on November 18, 1986, at midnight, defendant's mobile telephone was used to call another mobile telephone and the call lasted six minutes and nine seconds. The calling car was located northeast of 58th Street and Halsted. The receiving car was located southeast of 58th and Halsted. A second call was made on defendant's mobile telephone to the same mobile telephone eight minutes later. The cars were still within their original location areas.

As to defendant's motion to quash his arrest and suppress his subsequent confessions for involuntariness and violation of his right to counsel, defendant testified that on November 24, 1986, he was asked to meet Officer O'Neill. Defendant was an informant for O'Neill and was running an undercover operation on Stokes' drug empire activities. They met at 2 p.m. and drove in the squad car to Area 3 headquarters to view a composite drawing of the offenders. At the station, they met Cline, and defendant was told to wait. After a short time, O'Neill and Cline drove defendant to Area 2 headquarters. Defendant complied with their order to strip, to see if he was wearing a "wire." He was put in an interview room, where he remained until late the next day.

The police told him they had records of mobile telephone conversations between defendant and Taylor on the night of the murders. "They said they had somebody that can say I was setting up the hit, you know, with Elliot Taylor." He was shown telephone records, but no transcript of the conversation.

The police also showed defendant seven photographs of suspects in the shooting, but defendant could identify no one. They showed him a couple of photographs of dead children who were unrelated to the Stokes murder, and a photograph of a friend of defendant's who had

been shot in an unrelated incident. The police said defendant and his family could get protection in exchange for defendant's giving the police the identities of the shooters. The police threatened to leak information that defendant was an informant and had set up the hit, and warned defendant that Stokes' associates might hurt defendant or his family. They never indicated the police would hurt him.

The police also told defendant they realized he just thought it was supposed to be an armed robbery, not a murder. As a result, defendant gave the court-reported confession, because he thought the police would then let him go.

On the evening of November 24, defendant gave an oral statement to the police. He was given dinner that night. He gave a court-reported statement about 24 hours later. The interrogation continued throughout November 24 and 25. He was not allowed to sleep, and he had no bed. However, from 1 a.m. until 8 a.m. on November 25, he was left alone. He declined breakfast on November 25. Throughout the time at the station, he was allowed to use the bathroom frequently and was never struck or threatened by an officer.

Defendant testified further that during the two-day interrogation he frequently asked to telephone an attorney. When he gave the court-reported statement, he asked to see a lawyer both before and afterwards. They would not allow him to telephone anyone until he "cooperated" by making the court-reported statement. He was never read his *Miranda* rights.

Officers Michael Baker, Joseph M. Danzl, John Solecki, David J. Dioguardi, Thomas McKenna, Phillip Cline, Robert O'Neill, Robert Fitzgibbons, and Assistant State's Attorney Michael O'Donnell testified for the State. They all testified to substantially the following facts in regard to the relevant time periods they were with defendant on November 24 and 25, 1986.

Defendant was a paid informant for the police in connection with his four-week job as bodyguard for Stokes. He had also worked on other cases with the police. After the shootings, on November 18 and 19, the police had defendant stay at a motel for a few days for safekeeping. They were concerned about his well-being because he had witnessed the murders and because he was a narcotics informant. O'Neill was shocked when Cline informed him about the telephone records and defendant's involvement in the shootings. O'Neill arranged to meet defendant at a parking lot on November 24 at 2 p.m.

On November 24, at 2:30 p.m., defendant arrived at Area 3 headquarters with O'Neill. Defendant was there for one-half hour and was not questioned. At approximately 5 or 5:30 p.m., delayed because of

heavy traffic, defendant arrived at Area 2, where he was arrested. Cline and O'Neill drove defendant to Area 2. Cline did not know if defendant was searched there, but assumed he was patted down.

At 6:15 p.m., McKenna, Baker and Danzl spoke with defendant for one-half hour. They read defendant his rights, which he stated he understood. They showed defendant Cellular One telephone records and told him they had evidence of telephone conversations that he was setting up a robbery and/or homicide of Stokes.

At 8 p.m., Cline, Fitzgibbons and O'Neill spoke with defendant for 30 or 40 minutes. They first read defendant his rights, which he stated he understood.

At 11:45 p.m., Solecki and Dioguardi spoke with defendant for about an hour. They again read defendant his rights, which he stated he understood.

On November 25, at 8 a.m., Cline saw defendant, who had just wakened. Defendant refused food. At 1:30 p.m., Cline and O'Donnell spoke with defendant for about 30 or 40 minutes. Defendant was first read his *Miranda* rights, which he stated he understood. Defendant agreed to give a court-reported statement.

At 2:55 p.m., defendant gave a 13-page, court-reported statement. He stated that he had been read his rights and understood them. He had been treated well by the police and was making the statement voluntarily. He read the transcribed statement, made changes, initialled the changes, and signed the statement.

The officers and O'Donnell denied showing defendant any photographs; denied saying his family would be harmed by Stokes' associates; denied offering defendant protection in exchange for identifying the shooters; and testified that defendant never asked to see an attorney. Fitzgibbons testified that late on November 24, defendant expressed some concern for his family. "At some point the offer was made that his family could be protected or might be—attempt to be made to protect the family." The interview room defendant was kept in did not have a bed.

The trial court denied the motion to quash arrest and suppress evidence and confession, and the trial proceeded.

In view of the nature of defendant's contentions on appeal, we will not recite the testimony adduced at trial, with the exception of defendant's confession. If certain testimony is pertinent to our discussion of any of the issues, it will be set forth in our analysis.

Assistant State's Attorney Michael O'Donnell testified regarding defendant's confession. O'Donnell read the 13-page confession to the jury. The confession included the following facts relevant to the issues

before this court.

Several weeks before the shooting, defendant met with Taylor. Taylor had agreed to give defendant a car telephone several weeks earlier. The Friday before the shooting, Taylor and defendant met. Defendant agreed to set Stokes up for an armed robbery in exchange for Taylor's forgiving an $800 debt defendant owed him for cocaine. On the night of the shooting, defendant, as bodyguard, followed the victims from a movie theater to 47th Street, then took 53rd to Woodlawn, Woodlawn to 51st, 51st to King Drive, then to 48th and Indiana to 47th. They stopped at a restaurant. Defendant kept Taylor apprised of the route on the car telephone. They went down 47th Street to 51st Street to the expressway, to 79th and Calumet, where they stopped at a grocery store for 10 minutes. "I told him I'm going to leave the phone off the hook, you know, lay the phone down and I'll get back in touch with him when I got back in the car." They were 1½ miles from Miller's home. Defendant told Taylor they were "going in. I said tell the boys not to run away. And I said you're going to need two bodyguards when this is all over with." They stopped at a liquor store at 79th and Cottage Grove.

When they arrived at 7941 South Ellis, two men came out and started shooting at Stokes' car. Defendant got out and shot over their heads several times. He did not shoot at them because he knew Taylor had sent them to rob Stokes.

Defendant first contends that the warrantless search of his car telephone at the murder scene was illegal because there was no probable cause and the seizure was not effectuated as incident to arrest. Defendant maintains that the car telephone was crucial to the State's case because it enabled the police to obtain the telephone records.

■ ■ ■ Determining whether the police have probable cause to conduct a search requires an examination of the officer's factual knowledge based on his law enforcement experience. (*People v. Stout* (1985), 106 Ill. 2d 77, 477 N.E.2d 498.) Probable cause exists when the totality of the facts and circumstances known to the officer at the time of the search would justify a reasonable person in believing that contraband was present in the automobile. (*People v. Clark* (1982), 92 Ill. 2d 96, 440 N.E.2d 869.) We will not disturb the trial court's ruling on a motion to suppress unless it is clearly erroneous. *People v. Clark*, 92 Ill. 2d 96, 440 N.E.2d 869.

■ We cannot say that the trial court's determination here was clearly erroneous. The police found defendant at the murder scene, standing next to the bodies, waving a gun, and initially refusing to put the gun down, forcing an officer who was pointing a gun at

defendant to repeat the order. The most significant piece of information the police had concerned the physical evidence at the scene, because it contradicted defendant's story.

Defendant repeatedly told the police at the scene, with precise details, about each shot he fired at the assailants, and about the man who was struck by one of those bullets. The police conducted several thorough searches of the grass, streets, curbs, vehicles and buildings in a two-block area. They found no blood, no bullet holes, no shattered glass, no scratched or dented cars, and no other damage to nearby buildings. Also peculiar was the fact that defendant shot at the assailants from a short distance of only two car lengths. Yet they never returned defendant's gunfire, despite their more than adequate weaponry. Defendant testified, incredibly, that they simply were not paying any attention to him.

Added to all this information, Cline learned from Miller that Stokes carefully avoided regular habits and was cautious when he and Miller were out. Cline could reason, based on his experience as a police officer, that Stokes was in fact set up by someone familiar with the plan and able to discover and immediately report to accomplices the last-minute timing of the arrival at the house.

Having reasoned that defendant might be involved in the murders, it was reasonable to believe that the mobile telephone would be used in the necessarily last-minute decision to begin the shooting. By taking the telephone, the police could discover or verify its telephone number, the cellular telephone company servicing the telephone, and thus obtain the highly relevant telephone records.

■ Defendant's argument that his car was "parked" and, therefore, the automobile search exception does not apply is without merit. Defendant's car was double parked in a lane of traffic at a murder scene, with the keys in it and engine running. It was not unreasonable to seize the telephone, considering the totality of circumstances known to the police at the time the telephone was seized. We hold that the trial court could properly find that the police had reasonable grounds to believe that defendant's car telephone could be evidence of criminality.

Defendant also contends that the trial court erred in denying his motion to suppress evidence regarding an anonymous informant's report that he overheard a mobile telephone conversation on the night of the shooting. Defendant argues that an anonymous person acting without authority or consent and secretly listening to defendant's alleged mobile telephone conversations constituted illegal eavesdropping under State and Federal law.

■■ The Illinois legislature has declared that eavesdropping is a criminal offense. (Ill. Rev. Stat. 1985, ch. 38, par. 14—2.) Any evidence obtained in violation of section 14—2 is inadmissible in any civil or criminal trial. Ill. Rev. Stat. 1985, ch. 38, par. 14—5.

■■ ■ Eavesdropping is defined as hearing or recording a conversation without the consent of any or all parties to the conversations, through the use of an eavesdropping device. (Ill. Rev. Stat. 1985, ch. 38, par. 14—2.) An eavesdropping device is "any device capable of being used to hear or record oral conversations whether such conversation is conducted in person, by telephone, or by any other means." (Ill. Rev. Stat. 1985, ch. 38, par. 14—1(a).) Defendant maintains that the standard radio scanner used by the informant was an eavesdropping device. We do not agree. The key fact is that radio scanners, which are readily available to the general public, are capable of picking up the FM radio signal which mobile telephones use to transmit their signals. Any scanner on that frequency would pick up the audio sound the same as if it were picking up a broadcast from a radio station.

In addition to the common knowledge that conversations transmitted by radio waves may be easily intercepted, the user's guide accompanying the particular mobile telephone at issue here informed the user of this fact. The trial court properly relied on the fact that the guide makes it clear that the telephone used radio waves, including warnings about the danger of detonating explosives on the same frequency and warnings about using obscene language that may be picked up on the air. Similarly, in *State v. Delaurier* (R.I. 1985), 488 A.2d 688, the court held that a user's manual for a cordless telephone which operated by transmitting signals over radio waves fully advised the user that, given the nature of the telephone, privacy was not ensured.

■■ We have found no indication in the statute or the relevant case law that the penal eavesdropping statute was meant to embrace a standard radio scanner as an eavesdropping device. Criminal statutes are not to be read expansively to include more than what is plainly included within the statutory language, since that would defeat the statute's purpose of fairly apprising persons of the boundaries of the prohibited action. See *Kordel v. United States* (1948), 335 U.S. 345, 93 L. Ed. 52, 69 S. Ct. 106; *Acme Fireworks Corp. v. Bibb* (1955), 6 Ill. 2d 112, 126 N.E.2d 688.

Under the Federal counterpart of our statute (18 U.S.C. §2510(4) (1988); see *People v. Beardsley* (1986), 115 Ill. 2d 47, 503 N.E.2d 346 (court held that its interpretation of eavesdropping is consistent with

Title III)), it has been held that an ordinary AM radio is not an eavesdropping device. (*State v. Delaurier*, 488 A.2d 688.) The court in *Delaurier* held that the term "device" did not include the AM radio over which an individual heard defendant's conversation on a cordless telephone which operated by means of radio waves. We agree with the court's reasoning and find it applicable here. The eavesdropping statute "simply was not intended to prevent anyone from listening to an AM broadcast, put on the air voluntarily, and accessible by anyone possessing an ordinary AM radio." *Delaurier*, 488 A.2d at 694.

The purpose of the eavesdropping statute is to protect an individual's rights to a legitimate expectation of privacy. It will not be used, however, to reach an absurd result. (*People v. Clark* (1984), 125 Ill. App. 3d 608, 466 N.E.2d 361.) The courts addressing the issue of expectation of privacy in a conversation on a telephone which transmits by radio waves have overwhelmingly held there is no such expectation of privacy. *Tyler v. Berodt* (8th Cir. 1989), 877 F.2d 705; *United States v. Hall* (9th Cir. 1973), 488 F.2d 193; *United States v. Hoffa* (7th Cir. 1970), 436 F.2d 1243; *Edwards v. Bardwell* (M.D. La. 1986), 632 F. Supp. 584, *aff'd mem.* (5th Cir. 1986), 808 F.2d 54; *State v. Smith* (1989), 149 Wis. 2d 89, 438 N.W.2d 571; *State v. Howard* (1984), 235 Kan. 236, 679 P.2d 197; *People v. Fata* (1988), 139 Misc. 2d 979, 529 N.Y.S.2d 683.

■ Defendant argues that denial of his motion to suppress was erroneous because the person listening on the scanner violated Federal law. Under the holdings listed above, it is clear that defendant had no justifiable expectation of privacy and no protection under those laws. (See 18 U.S.C. §§2510(2), 2511 (1988) (Wiretap Tap Act).) There is also no expectation of privacy under the Communications Act (47 U.S.C. §605 (1982)). *Edwards v. State Farm Insurance Co.* (5th Cir. 1987), 833 F.2d 535; *United States v. Rose* (1st Cir. 1982), 669 F.2d 23.

We hold that the type of scanner at issue here, which can pick up FM radio waves, including the radio waves which transmit signals from the type of mobile telephone used here, is not an eavesdropping device under the Illinois statute. Thus, the motion to suppress was properly denied on this basis.

Defendant also contends that the trial court erred in denying his motion to suppress the confessions. Defendant argues that the police obtained his confessions in violation of both his fifth and sixth amendment rights to counsel. Defendant maintains that his right to counsel attached when he was charged with unlawful use of weapons on November 18, 1986, and thus, he had a right to counsel at all subsequent

State-initiated interrogation, including his questioning and arrest for the murders on November 24 and 25, 1986.

 █ A person's sixth and fourteenth amendment right to counsel attaches when adversarial judicial proceedings are initiated against him. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) Defendant has cited no authority, however, to indicate the relevancy of the arrest for unlawful use of weapons to the right to counsel for the murder arrest. The attachment of the sixth amendment right to counsel for one charge clearly does not trigger the right to counsel with respect to other crimes for which defendant had not yet been charged. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612; *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228.) Where the State has initiated a prosecution on one charge, later incriminating statements relating to other crimes as to which the sixth amendment right has not yet attached are admissible at the trial of those offenses. (*Maine v. Moulton* (1985), 474 U.S. 159, 182 n.16, 88 L. Ed. 2d 481, 499 n.16, 106 S. Ct. 477, 490 n.16.) The weapons offense and the murder charges were "in every constitutionally significant aspect, separate crimes." (*United States ex rel. Espinoza v. Fairman* (7th Cir. 1987), 813 F.2d 117, 121 n.1; *United States v. Chu* (7th Cir. 1985), 779 F.2d 356.) The confessions here were used in the murder trial, not in a trial for the weapons offense.

 In regard to defendant's fifth amendment right, the right against self-incrimination requires that an individual have an attorney present to counteract the inherent pressures of custodial interrogation, regardless of the number of crimes under investigation or whether they result in formal charges. *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093.

There is nothing in the record to indicate defendant requested counsel when he was arrested for unlawful use of weapons. He was released on bond the same morning without appearing in court. He testified that the State's Attorney's office put up his bond. We fail to see how a person's right to counsel under the fifth amendment can be invoked by that arrest.

 Defendant also contends that he invoked his fifth amendment right to counsel during the November 24 and 25 interrogation. Whether there has been an intelligent waiver of such right depends upon the surrounding circumstances, including the accused's background, experience and conduct. (*People v. Martin*, 102 Ill. 2d 412, 466 N.E.2d 228.) When an individual has been admonished of these rights, indicates he understands them, and gives a statement without asking for a lawyer, a court can find he waived a known right. *People*

*v. Martin,* 102 Ill. 2d 412, 466 N.E.2d 228.

■■ Eight officers and an assistant State's Attorney testified that defendant was repeatedly advised of his *Miranda* rights, which he always indicated he understood. He never requested an attorney. Moreover, defendant had been arrested many times and was familiar with the legal system. In addition, defendant believed his ongoing relationship with the State's Attorney's office offered him some protection. We find no error in the trial court's consideration of the witnesses' credibility and finding that defendant never invoked a fifth amendment right to counsel.

■■ ■ Defendant maintains further that the motion to suppress the confessions should have been granted because his statements were involuntary. Whether a statement is voluntary depends upon the totality of the circumstances. The test is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) Voluntariness must be established by a preponderance of the evidence. (*People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68.) The related questions of credibility of the witnesses are best resolved by the trial judge, whose determination will be upheld unless contrary to the manifest weight of the evidence. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223; *People v. Higgins,* 50 Ill. 2d 221, 278 N.E.2d 68.

Defendant points to the facts that his statements were not made until he was interrogated for 24 hours and that he was deprived of sleep. The record indicates, however, that defendant was arrested late in the afternoon on November 24. At 6:15 p.m., he was interviewed for 30 minutes. At 8 p.m., he was interviewed for 30 minutes, and he orally confessed to his participation in the crimes. At 11:45 p.m., he was interviewed for 75 minutes. Defendant was not interviewed from 1 a.m. until 8 a.m., when Cline saw him just as defendant was waking up. On November 25, at 1:30 p.m., defendant was interviewed for 30 or 40 minutes. At 2:55 p.m., defendant gave his court-reported statement.

Defendant points out that he made no telephone calls until after the court-reported statement, which he believes proves he was held incommunicado, which in turn indicates his statements were involuntary. The court could properly rely on the credibility of the witnesses who testified defendant never asked to make a telephone call.

Defendant notes that the police offered to protect his family if he confessed. Defendant said he was concerned about his family's safety, and one officer testified that the police said they could offer some

protection. If any offer of protection was made, it is only one factor to be considered in determining the question of voluntariness. *People v. Kashney* (1986), 111 Ill. 2d 454, 490 N.E.2d 688; *People v. Makes* (1981), 103 Ill. App. 3d 232, 431 N.E.2d 20.

■■ Considering all the circumstances, we cannot agree with defendant that his will was overcome at the time he confessed. The evidence indicates there was no continuous interrogation; the questioning was brief; he slept, ate and drank; and he stated in his court-reported statement he was treated well. Defendant was experienced in the criminal justice system, and he was continuously advised of his rights.

■■ Defendant also contends that the trial court erred in denying his motion to quash arrest because there was no probable cause for his arrest for murder on November 24. Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a person of reasonable caution to believe that an offense was committed and the defendant committed the offense. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475.) The key considerations are factual and practical considerations of everyday life, and are not unduly technical. (*People v. Lucas* (1980), 88 Ill. App. 3d 942, 410 N.E.2d 1040.) This court will not disturb a ruling on probable cause for arrest unless it is manifestly erroneous. *People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112.

The evidence presented at the hearing on the various pretrial motions (*People v. Hall* (1987), 164 Ill. App. 3d 770, 518 N.E.2d 275) established the information known by the police on November 24, when defendant was arrested for the murders.

■■ Defendant was present at the murder scene. His car was parked directly behind Stokes' car, but was untouched by the gunfire from an Uzi submachine gun, sawed-off shotgun and pistol. Defendant claimed he shot at the assailants, who stood two car lengths away, and perhaps hit one of the men, yet they did not return his fire. After several searches, the police could find no physical evidence to support defendant's statement that he shot repeatedly at the offenders. Defendant saw the offenders run quickly from the scene, while other witnesses saw the men walk away.

In addition, information from Miller indicated the murder of Stokes was set up by someone familiar with his cautiously unpredictable schedule. Telephone records indicated that defendant placed one six-minute call to a mobile telephone registered to Elliot Taylor, with whom defendant shared a long history, just after midnight, and a second 14-minute call to the same number. The police were aware that

both Stokes and Taylor were reputed drug dealers.

Finally, the police knew that an anonymous caller had overheard a mobile telephone conversation on a scanner that night. The conversations occurred just before the shooting. One person detailed the exact route being taken by several people. The route matched that which defendant told the police he and Stokes followed just prior to the murders.

While the anonymous caller did not identify defendant as one of the persons participating in the overheard conversation, defendant admits he was using the telephone during the half-hour in question and that he was the only person in the car. The telephone records indicate the area of the city in which defendant's car, and the car telephone he was calling, were located when he placed the two telephone calls. The route defendant admitted using and that described in the overheard conversation were the same.

Defendant's argument that the State failed to show the anonymous caller was reliable is without merit. No such showing need be made where, absent indications that he was being paid by the police, there is a presumption that he is an ordinary citizen whose information is inherently reliable. *People v. Hall,* 164 Ill. App. 3d 770, 518 N.E.2d 275.

We hold that the trial court's finding of probable cause for defendant's arrest is not manifestly erroneous.

Defendant next contends that he was denied a fair trial because the court belittled defense counsel in the presence of the jury.

■■ ■ In order for the comments by a judge to constitute reversible error, defendant must show that they constituted a material factor in the conviction or were of such a nature that the probable result was to affect the jury's verdict. (*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) We have carefully reviewed the portions of the record cited by defendant. We find nothing to indicate that prejudicial error occurred. There is no error where the court merely rules unfavorably to a party or where it properly admonishes counsel. See *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 449 N.E.2d 568.

Defendant also contends that photographs of the crime scene and the victims' bodies were prejudicial and inflammatory and should not have gone to the jury. Defendant maintains that the photographs had no probative value since the victims' cause of death was not an issue.

■■ The crime scene photographs accurately portrayed the scene to the jury. In regard to the morgue photographs, the court held back the most offensive pictures. Photographs of the crime scene would show, *e.g.,* the wilfulness of the acts in question, the fact that the vic-

tims' car was covered with bullet holes, while defendant's car was untouched by gunfire, and generally show the condition of the crime scene. The morgue photographs showed the force used against the victims, the deliberate manner of the killing, and number and location of wounds and cause of death, thus corroborating the pathologist's testimony. See *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; see also *People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247 (photographs of post-autopsy victim with brain fragments near hair may be admitted even where defendant offers to stipulate as to matters shown therein).

Defendant points to one comment by the trial court that the photographs were "pretty gross." The grotesqueness of photographs does not prohibit their publication to the jury, where the photographs are probative of the relevant facts. (See *People v. Lindgren*, 79 Ill. 2d 129, 402 N.E.2d 238.) We find no abuse of discretion in admitting the photographs into evidence.

Defendant also contends that the trial court erred in permitting testimony regarding the mug shot of Elliot Taylor. Cline stated that defendant reported Taylor's involvement in setting up Stokes' murder. Cline showed defendant an "IR photo" of Elliot Taylor, which defendant identified as Taylor. Cline then directed other officers to try to locate Taylor and investigate further both Taylor and his car's mobile telephone.

The court asked, "What is an IR photo?" Cline replied that it is a photograph taken of an arrestee at the police station. The State later offered a blown up picture of Taylor's mug shot. The court denied defendant's motion for a mistrial. The photo was not sent back to the jury.

Defendant argues that "[j]ust as evidence suggesting that a defendant has a criminal background is inadmissible absent a specifically relevant purpose ***, evidence regarding the defendant's alleged confederate's prior criminal activity should be inadmissible." He maintains that the prosecution's "efforts to dirty Taylor resulted in [defendant] being prejudiced, albeit unfairly."

Defendant cites no authority, and this court knows of no support, for the argument that evidence of prior arrests of someone other than defendant should be prohibited. No error occurred.

We next address defendant's contention that the testimony of Cline on rebuttal was inadmissible hearsay and violated his right to a fair trial. Cline was called to rebut defendant's testimony that he was told by Cline that there were tapes of defendant on his mobile telephone giving directions about Stokes' whereabouts. Defendant testi-

fied that these tapes were not shown to him, and that Cline never told him an anonymous citizen overheard his conversation on the telephone.

In rebuttal, Cline stated that he never told defendant there were tapes of him talking to Taylor. Cline then testified as to what he told defendant had been overheard. Defendant offered his first objection when Cline was asked where he received the information regarding the conversation.

■■ ■ The trial court, in a side bar, repeatedly stated that defendant failed to object to Cline's testimony as to the substance of what defendant was told was overheard. We agree, and find the issue is waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

Moreover, where defendant did not object to Cline's testimony on direct examination, but questioned him extensively on cross-examination regarding the same testimony, any error is waived. *People v. Gully* (1986), 151 Ill. App. 3d 795, 502 N.E.2d 1091; *People v. Bost* (1980), 80 Ill. App. 3d 933, 400 N.E.2d 734.

In addition, where a defendant opens the door to an issue on direct examination, he interjects the issue into his case. He cannot then contend that bringing it to the attention of the jury is error. (*People v. George* (1971), 49 Ill. 2d 372, 274 N.E.2d 26.) He invited or acquiesced in the admission of the evidence, even if it was hearsay testimony. (*People v. Payne* (1983), 98 Ill. 2d 45, 456 N.E.2d 44.) Cline's rebuttal testimony, although hearsay, does not require reversal.

■■ Defendant finally contends that he and his ex-wife were improperly impeached with prior convictions. Defendant failed to object at trial and thus has waived the issue on appeal. (*People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) Moreover, it was defendant himself who introduced evidence of his and Peggy Wilson's prior convictions.

In view of our holdings, we need not address defendant's contention that the cumulative effect of the errors mandates reversal.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LaPORTA, P.J., and RAKOWSKI, J., concur.