THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
IRA JACKSON, Defendant-Appellant.

First District (1st Division)   No. 1—88—0730

Opinion filed August 17, 1992.

Kathleen T. Zellner & Associates, of Naperville (Kathleen T. Zellner and Michael Hemstreet, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Jane Liechty Loeb and Michele I. Lavin, Special Assistant State's Attorneys, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

An indictment returned in the circuit court of Cook County charged Ira Jackson (hereafter defendant), Allen Falls, Dwayne Coulter, and John Annerino with the murder of Cook County Sheriff's Deputy Michael Ridges, and with conspiracy to kill Robert Fischer. Annerino died prior to trial. The trial judge granted defendant a severance from Coulter, but ruled that defendant and Falls would be tried together using different juries. In a separate trial, Coulter was

convicted of the murder of Ridges and conspiracy to kill Fischer, and this court affirmed his conviction in *People v. Coulter* (1992), 230 Ill. App. 3d 209. Following a jury trial, defendant was found guilty and sentenced to a prison term of 40 years on the murder count and seven years on the conspiracy count. On appeal, defendant contends that: (1) his conviction is invalid because his indictment did not charge him with felony murder pursuant to section 9—1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)); (2) the trial court erred in failing to sever his two charges of murder and conspiracy to commit murder; (3) his inculpatory statement was made involuntarily because Sergeant Reed failed to advise him of his *Miranda* rights; and (4) the State failed to prove him guilty of the murder of Officer Ridges beyond a reasonable doubt. For the following reasons, we affirm defendant's conviction.

On October 17, 1985, Officer Ridges was found shot to death at the intersection of Willow Road and Route 83 in Prospect Heights, Illinois. The record reveals a series of relevant facts which connect defendant to John Annerino, Robert Fischer and, ultimately, to Officer Ridges. At trial, Robert Fischer testified that he met John Annerino in August 1984 at a bar called "Halsted's" in Chicago while he was working as a security guard at an adjacent bar called the "Loading Dock." Fischer and Annerino struck up a friendship, and Annerino told Fischer that he wanted to open up a bar, but because he worked for the Chicago city clerk's office he was not allowed to own any businesses. Annerino proposed that Fischer become a "front" for such a business, and Fischer agreed.

Annerino also told Fischer that he was the minister of the Guardian Angel Spiritual Independent Church, which was located in his home at 515 West 28th Place, Chicago. Fischer replied that he, too, was a minister. Annerino told Fischer that he was planning on retiring soon and asked Fischer to take the senior pastor's position at his church. One of the conditions of the position was that Fischer had to live at Annerino's home.

Fischer moved into Annerino's home and, subsequently, Annerino put Fischer's name on several bank accounts. In January 1985, Annerino arranged for Fischer to take a position as a license examiner in the city clerk's office. Annerino also purchased a Lincoln Continental in the name of the church for Fischer's use.

Between February and May 1985, Annerino made sexual advances toward Fischer, and Fischer was not responsive. On May 11, 1985, Mother's Day, Fischer talked to his mother on the phone. After the conversation, Annerino threw a tantrum and accused Fischer of hav-

ing received a message from his mother about a woman with whom Annerino alleged Fischer was having a relationship. Fischer told Annerino he was leaving the church. Annerino replied that the church was a lifetime commitment and that Fischer could never leave unless he was in a casket. He told Fischer he would "stomp on him like a cockroach" if he left the church. Fischer subsequently moved out on June 30, 1985, and went to live with his mother at 704 Maple Street in Prospect Heights.

On July 1, 1985, Fischer reported to work at the clerk's office and Annerino informed him that he was fired. Fischer responded that he could only be fired by Walter Kozubowski, the city clerk. Annerino ran into Kozubowski's office and five minutes later Kozubowski summoned Fischer and told him that he was being let go because he was not doing his job properly.

On August 2, 1985, at approximately 5 a.m. a brick was thrown through the living room window of Mrs. Fischer's house. The Fischers called the police and Cook County sheriff's police officer Dean Endre responded to the call. At 5:58 a.m., Fischer received a phone call and Officer Endre listened in on the extension. A male caller stated, "Did you see what happened earlier, Bobby? Your whole f---ing world is about to come to an end."

On August 12, 1985, Fischer was served with a lawsuit demanding $35,000 in storage, room and board for the six-month period Fischer stayed with Annerino. Fischer filed a countersuit for return of his personal possessions. On October 5, 1985, Fischer was shot at as he drove home from his job as a security guard at "Christopher Street," a bar on Halsted Street in Chicago. He was unharmed, but retrieved a bullet that had lodged in his seat belt. Fischer reported the incident to the Chicago police.

On October 15, 1985, Fischer received a call from a man claiming to be a Chicago police officer. The man stated that he had an arrest warrant for Fischer because he was two months behind in car payments and that he would come to arrest Fischer the next morning at 9:30 a.m. Fischer was not late on his car payments. Fischer called the Prospect Heights police, and the case was referred to Officer Michael Ridges.

On October 17 at 9 a.m., Officer Ridges came out to Fischer's house, talked with Mrs. Fischer for about 10 minutes, and then left. Later that day, Fischer learned that Officer Ridges had been shot at at Willow Road and Route 83, approximately 1½ blocks from the Fischer home.

Park Ridge police detective Joseph Burke testified that on October 17 around 9 a.m. he was off duty, driving east on Willow Road, when he noticed a car parked east of Route 83. He also saw a blue Cadillac. Two black males were standing at the left rear of the Cadillac and one black male was standing at the right rear of the Cadillac. He saw a white male walk around the front of the Cadillac from the front passenger side to the driver's side. After the traffic cleared, he turned and drove north on Route 83. When he arrived at work later that day, he heard a news bulletin that a Cook County sheriff's police officer was shot in the vicinity of Route 83 and Willow Road.

James Lussky, a Cook County sheriff's police officer, testified that at 9:20 a.m. he received a radio message from Officer Ridges for backup at a traffic stop at Willow Road and Route 83. Lussky was en route to that location when he heard a radio broadcast that an officer was shot in that vicinity. When Officer Lussky arrived at the scene, he discovered Ridges' body and found Falls' driver's license nearby.

Chicago police officer John Kucharski testified that he heard a broadcast over his police radio at 9:40 a.m. that a blue Cadillac was wanted in connection with the shooting of a police officer at Willow Road and Route 83. Kucharski and other Chicago police officers responding to the call located the Cadillac on the Kennedy Expressway, stopped the car at Lawrence Avenue, and ordered defendant, Coulter and Falls out of the car. Coulter was dressed as a police officer in a blue shirt with a "Chicago Police Department" patch, and was carrying a .38 caliber gun. Police found pieces of paper bearing both Mrs. Fischer's name and phone number and Annerino's address and phone number in Coulter's pockets. On the front seat Kucharski found a .22 caliber revolver and a police star. In the back seat, he found a blue cap with a shield and a police scanner. Upon their arrest, the three men were given their *Miranda* warnings by Chicago police officer Teddy Ochocki.

Subsequently, defendant was transported to the 16th District police station whereupon he was placed in a tactical office. Officer Ochocki read defendant his rights again and defendant acknowledged them. At approximately 11 a.m., Cook County sheriff's police Sergeant John Reed read defendant his *Miranda* rights and defendant acknowledged his rights. Defendant stated that he did not shoot Ridges. Defendant stated that earlier that morning he was picked up by his cousin, Falls, in a 1975 blue Cadillac. The Cadillac belonged to defendant, but Falls drove because he had a valid driver's license. Coulter was sitting in the back seat, but defendant said he did not

know Coulter's name at that time. They stopped for gas and then drove along and he fell asleep. Defendant stated that everything was "kind of hush hush" in the car.

When defendant awoke, he asked to use the bathroom. Coulter told Falls to keep driving. Then defendant heard police sirens, looked around and saw a small car with flashing lights. Falls stopped the car. The officer approached them, asked them to get out of the car and to show him identification. Defendant told the officer that he did not have any identification because he did not have any pockets. The officer approached Coulter and asked him "Are you a police officer or a security guard?" Coulter replied, "I am a security guard." Then the officer asked Coulter for identification. Coulter patted himself as if looking for identification, then began to reach into the car. The officer said, "Do you have a weapon?" As the officer reached for his weapon, Coulter pushed the officer back, drew his revolver, holding it in both hands, and fired three times. Then they all got back into the Cadillac and drove onto the expressway. Subsequently, they were stopped by the Chicago police department.

Sergeant Reed stated that at the time of arrest, defendant was dressed in a sweat suit with a small hood and knee length socks. Defendant told Reed that he thought the purpose of the drive was to look for jobs at Sears in Schaumburg. The conversation lasted for about 30 minutes.

After talking to defendant, Sergeant Reed handcuffed him to his own arm and took him to the Maybrook facility of the Cook County sheriff's police. On the way they stopped at a gas station. Jackson asked for a pack of Newport cigarettes, and Sergeant Reed bought them for him. Then they went to McDonald's and Sergeant Reed bought defendant a Big Mac and a vanilla shake. At 1 p.m. defendant was advised of his rights by Assistant State's Attorney Richard Stock. Defendant stated that he understood his rights and spoke with Stock for about 25 minutes. That evening, at about 7:20 p.m., Stock spoke to defendant a second time and again advised defendant of his *Miranda* rights. Defendant acknowledged his rights and said that the police had already advised him of them. Defendant made a statement to Stock, which was completed at around 8 p.m. The statement was transcribed by a court reporter, but defendant refused to sign the statement on the advice of his attorney.

The next day at approximately 6:55 p.m., Sergeant Reed was in a room at Maybrook with defendant waiting for another officer to return with defendant's dinner. At that point defendant said to Reed, "What would it take to walk out of here today and come back and

testify at a later date?" Sergeant Reed replied that he would consult with the State's Attorney's office but that the case was complicated since the police had found a connection between Coulter and Annerino. Defendant said he could not stand to be locked up and that he would kill himself if he was locked up. Then defendant stated, "If I told you everything about Annerino, could I walk out of here today and come back later and testify?" Sergeant Reed again responded that he would have to talk to the State's Attorney, but asked defendant "What can you tell us?"

Defendant replied that a few weeks before Ridges was shot Annerino approached him and his cousin Falls and offered them $3,000, then $6,000, then $9,000 to kill Fischer. Defendant stated that he did not know Fischer, but that he had seen a picture of him. He stated that he and Falls did not personally want to kill anybody so they referred Annerino to Coulter, who was a security guard. Defendant stated that Coulter had a gun and was always interested in making some fast money.

Defendant said that the day Ridges was shot he, Falls and Coulter drove slowly out to Fischer's home, "saw the little car there," and the little car pursued them. Defendant stated that Coulter got ready for the officer by cocking his gun, and when the officer came up, Coulter shot him. Defendant stated that Annerino had paid him $150 for going out to Fischer's house one other time. Defendant stated that he was afraid of being locked up in the county jail because Annerino had the power to put a "hit" on him in the jail. Defendant then stated that he would not say anything further unless he had something in writing from the State's Attorney's office.

Reed stated that on October 21 he executed a search warrant at 515 West 28th place, Annerino's home, and found a piece of paper with defendant's and Falls' phone numbers and addresses and the notation, "any time." Reed also found letterhead stationery of "Morgan Finley, Clerk of the Circuit Court," with the name "Robert Fischer" and the address "704 N. Maple."

Vincent Steven Calvin testified that defendant and Allen Falls asked him if he would like to make some money, and he agreed to shoot a man for $2,000. On October 16, Calvin went out to Prospect Heights with defendant, Falls, Coulter, and Bobby Lindsey. Calvin stated that in the car defendant gave him a .22 caliber revolver, showed him a picture of Fischer, and told him to go to Fischer's door and pretend that he was selling aluminum siding. Someone else in the car said that if they were stopped by the police, they should say they were looking for a job in Schaumburg. Calvin went to the door and

was told that Fischer was not home. He told Coulter, and they left. When they got back to Chicago, Coulter made a phone call and then told Calvin they had to go back out there. Calvin told Coulter he would not go back.

Bobby Lindsey testified that he had gone out to Fischer's house the night before with Falls and Coulter and had received the same instructions. Lindsey stated that defendant told him that they wanted to kill Fischer because he stole some cocaine from them.

The State rested and defendant presented no witnesses on his behalf. Following closing arguments and deliberations, the jury returned a guilty verdict against defendant for both murder and conspiracy to commit murder. Judgment was entered on the verdict, and the trial judge denied defendant's motion in arrest of judgment. Following a sentencing hearing, the trial court sentenced defendant to a prison term of 40 years for murder and 7 years for conspiracy to commit murder. Defendant's timely appeal followed.

Initially, defendant contends that his indictment was defective because it charged him with murder under Criminal Code sections 9—1(a)(1) and 9—1(a)(2) (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)), but that the jury was given instructions on the theory of felony murder pursuant to section 9—1(a)(3) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)). Defendant argues that because he filed a timely motion in arrest of judgment in which he specifically questioned "whether the verdict conformed to the indictment," his conviction must be reversed. The State initially responds that defendant has waived this issue for both failing to object to the instruction on that basis at trial and failing to file a written objection.

■ In order to properly preserve an error for review, a defendant must both object at trial *and* file a written post-trial motion raising the issue. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The record reveals that defendant did not object to the felony murder instruction at the jury instruction conference on the basis that he now claims is reversible error. The record further reveals that in his motion in arrest of judgment, defendant did not argue that the verdict failed to conform to the indictment, but only that the instructions "had no relation to the facts of the particular case." We agree that defendant has waived this issue.

However, even if defendant's argument is not waived, the law in Illinois recognizes only one offense of murder; thus, there is no requirement that a defendant be charged specifically under section 9—1(a)(3) in order to be convicted under the felony murder theory. (*People v. Maxwell* (1992), 148 Ill. 2d 116, 137.) Section 9—1(a) of the

Criminal Code of 1961 defines the offense of murder in the following terms:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter." Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a).

In *Maxwell*, our supreme court set forth the standard for review as considering "whether the variance between the murder charge and the proof and jury instructions has caused the defendant prejudice in his preparation for trial, and whether the variance may expose him to the risk of double jeopardy." *Maxwell*, 148 Ill. 2d at 137.

In reaching its decision, the *Maxwell* court relied upon *People v. Allen* (1974), 56 Ill. 2d 536, 309 N.E.2d 544. There, the defendant was indicted for murder under sections 9—1(a)(1) and 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1967, ch. 38, pars. 9—1(a)(1), (a)(2)), and the indictment did not specifically allege a felony murder theory as provided by section 9—1(a)(3) (Ill. Rev. Stat. 1967, ch. 38, par. 9—1(a)(3)). The *Allen* court found that the failure to allege a felony murder count in the indictment did not preclude the trial judge from later instructing the jury on that particular theory. The court explained that there was only one crime of murder, and that each of the subparagraphs under section 9—1(a) describes the mental state or the conduct of the defendant which must accompany the acts which cause the death. Thus, the court reasoned, if the defendant were charged with murder under subparagraph (a)(1) and acquitted, he could not again be charged and tried for the murder of the same individual under subparagraph (a)(2) or (a)(3); therefore, double jeopardy was not possible. (*Allen*, 56 Ill. 2d at 543.) The court further stated that the record did not show that the defendant was in any way misled by the indictment in the preparation of his defense, and that objections to the felony-murder instructions were not made on the basis of that contention. *Allen*, 56 Ill. 2d at 543.

In the present case, count I of the indictment returned against defendant charged him with murder under section 9—1(a)(1), alleging that he intentionally and knowingly shot and killed Michael Ridges.

Count II charged defendant with murder under section 9—1(a)(2), alleging that he shot and killed Officer Ridges knowing that such shooting created a strong probability of death or great bodily harm. The indictment did not charge defendant with murder under a felony murder theory, as provided in section 9—1(a)(3) of the Criminal Code. The jury instruction conference reveals that defendant was not surprised by the felony murder instruction. Defendant's objection to the felony murder instruction was not made on the basis that he did not prepare a defense to this charge.

Defendant admits that *Maxwell* is applicable to the present case and admits that the facts of the present case are similar to *Allen.* Therefore, we conclude that it was not error for the court to instruct the jury under section 9—1(a)(3).

Next, defendant contends that the murder and conspiracy to commit murder counts were improperly joined. Defendant also argues that the trial court had no discretion to consolidate the charges because they were not part of a "single" transaction.

Section 111—4(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 111—4(a)) provides:

"Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." Ill. Rev. Stat. 1985, ch. 38, par. 111—4(a).

Whether a defendant's acts were part of "the same comprehensive transaction" is not determined by precise factors, but rather by the facts presented in each case, and the matter is largely within the sound discretion of the trial court. (*People v. Mays* (1988), 176 Ill. App. 3d 1027, 1037, 532 N.E.2d 843, 849.) Important factors to consider in determining whether to sever charges include the proximity of time and location of the various charges; the identity of evidence which would be presented to prove each charge; whether the offenses shared a common method; and whether the same or similar evidence would establish the elements of the offenses. *People v. Coulter,* 230 Ill. App. 3d at 216-17.

■ Defendant argues that the murder of Officer Ridges and the conspiracy to kill Robert Fischer were not interrelated. However, the record indicates that Officer Ridges was killed within minutes of defendant's attempt to murder Fischer. Defendant told police that on the day of Officer Ridges' murder, he, Coulter and Falls drove out to Fischer's house for the purpose of murdering Fischer, but when they

saw "the little car" there, they drove away and the car pursued them. Defendant stated that Coulter "got ready for the officer by cocking his gun." When Officer Ridges approached them, Coulter shot him. The record indicates that the shooting occurred 1½ blocks from Fischer's house. The police recovered the following evidence from the Cadillac which tended to show that defendants were acting in furtherance of a conspiracy to kill Fischer: a .22 caliber revolver; a blue cap with a shield; and a police scanner. Police also recovered a .38 caliber gun and a piece of paper bearing Mrs. Fischer's name and phone number and Annerino's name and address from Coulter at the scene. Officer Ridges was shot with .38 caliber gun. The record indicates that the above evidence was used to establish both offenses at trial.

In *Coulter*, this court addressed the same basic facts and found that the record supported the trial court's discretion to deny severance of the charges against the defendant. (*Coulter*, 230 Ill. App. 3d at 216-17.) The cases relied upon by the defendant in the present case are the same as those distinguished by this court in *Coulter*: *People v. Fleming* (1970), 121 Ill. App. 2d 97, 257 N.E.2d 271 (felonies committed eight months apart); *People v. Edwards* (1976), 63 Ill. 2d 134, 345 N.E.2d 496 (evidence of an unrelated prior felony conviction created a significant risk that the jury would unfairly infer that the defendant had a propensity to commit crimes); and *People v. Olson* (1978), 59 Ill. App. 3d 643, 375 N.E.2d 533 (trial court's refusal to join the charges affirmed). Defendant has similarly failed to show that the murder and the conspiracy charges were improperly joined in the present case.

Next, defendant contends that his inculpatory statement to Sergeant Reed was involuntary because Sergeant Reed failed to advise him of his constitutional rights prior to interrogation. The trial court found defendant's statement voluntary and not the result of interrogation.

An individual subjected to custodial interrogation must be warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to counsel. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) However, voluntary statements of any kind are not barred by the fifth amendment and their admissibility is not affected by the holding of *Miranda*. (*Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726, 86 S. Ct. at 1629.) Whether a statement is voluntary depends upon the totality of the circumstances. The test is whether the statement was made freely, voluntarily and without compulsion or inducement or any sort, or whether defendant's will was overcome at the time he confessed. (*People v. Wilson* (1990), 196 Ill. App. 3d 997,

554 N.E.2d 545.) In making this determination, the court will consider factors including the duration of a defendant's detention prior to making the statement, a disregard of the necessities of life, deprivation of counsel, deception restricting the defendant's constitutional rights, and the defendant's age, education, emotional characteristics and his experience in criminal matters. (*People v. Dodds* (1989), 190 Ill. App. 3d 1083, 547 N.E.2d 523.) The related questions of credibility of the witnesses are best resolved by the trial judge, whose determination will be upheld unless contrary to the weight of the evidence. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.

Defendant argues that his second statement to Sergeant Reed was involuntary because almost 24 hours had passed between the last time he was advised of his rights and the time he made his second statement. Defendant relies on *Brown v. State* (1969), 6 Md. App. 564, 252 A.2d 272. In that case, a Maryland appeals court held that a written statement obtained through a second interrogation of a defendant was inadmissible because the defendant had not made a knowing waiver of his constitutional rights. The court noted that there was a time lapse of 18 hours between the time defendant was advised of his rights and made his inculpatory statement; that during that time defendant was transported 50 miles to a different location; that defendant was then interrogated by a different officer; and that defendant did not have a lawyer. *Brown*, 6 Md. App. at 570, 252 A.2d at 276.

■ *Brown* is neither controlling nor similar. The record in the present case indicates that defendant was advised of his *Miranda* rights five times prior to making his second statement to Sergeant Reed, and that defendant repeatedly indicated that he understood his rights. At the time defendant was transported from the 16th District police station to the Maybrook facility he had already been read his rights three times and acknowledged them each time. At Maybrook, defendant heard his rights twice and again acknowledged them. The record also shows that a lawyer was provided for defendant, that he acted on his lawyer's advice in refusing to sign his initial statement to Assistant State's Attorney Stock, that his questioning was brief, and that he was provided with food and drink.

The record further indicates that defendant initiated his second conversation with Sergeant Reed by asking what it would take to get out of jail, and Sergeant Reed suggested that he would talk to the State's Attorney. When defendant persisted, Sergeant Reed asked, "What can you tell us?" Finally, the record reveals that defendant was familiar with the criminal justice system as he had previously

been arrested and convicted for various offenses. Based on the totality of the circumstances, we cannot find that defendant's will was overcome at the time he made his second statement to Sergeant Reed.

■ Defendant further argues that Sergeant Reed engaged in interrogation because he asked defendant "What can you tell us?" We cannot agree that this question constitutes interrogation. " 'An officer's attempt to seek clarification of an ambiguous statement is not generally construed as interrogation for *Miranda* purposes if the question does not "enhance the defendant's guilt or raise the offense to a higher degree." ' " (*Butzin v. Wood* (8th Cir. 1989), 886 F.2d 1016, 1018, quoting W. LaFave & J. Israel, 1 *Criminal Procedure* §6.7, at 514 (1984); see also *People v. Cooney* (1985), 136 Ill. App. 3d 989, 996, 484 N.E.2d 802 (police officer's statement to defendant to "get it off his chest and to be a man" did not render defendant's statement involuntary).) We find no error in the trial court's consideration of the witness' credibility and finding that defendant's fifth amendment rights were not violated. We agree with the trial court that defendant's statement was voluntary and not made as a result of interrogation.

Finally, defendant contends that the State failed to prove him guilty of the murder of Officer Ridges beyond a reasonable doubt. Defendant argues that the evidence at trial showed that he was merely a passenger in a car stopped for a routine traffic violation and that Sergeant Reed's testimony that defendant stated "Coulter got ready for the officer by cocking the gun. When the officer came up, Coulter shot him," did not show that defendant was accountable for the murder of Officer Ridges.

The critical inquiry on review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Young* (1989), 128 Ill. 2d 1, 48-49, 538 N.E.2d 461, 472.

Section 5—2(c) of the Criminal Code provides that a person is legally accountable for the conduct of another if:

"Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other in the planning or commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).)

Intent to promote or facilitate the commission of a crime is proven by showing that, beyond a reasonable doubt, the defendant shared the criminal intent of the principal, or that there was evidence of a common design or a community of unlawful purpose. (*People v. Coleman* (1991), 222 Ill. App. 3d 614, 623, 584 N.E.2d 330.) Proof of a community of unlawful purpose may be drawn from the circumstances surrounding the commission of the crime, which may include an accused's presence at the commission of the crime without disapproving or opposing it. *Coleman*, 222 Ill. App. 3d at 623.

██ The record in the present case shows that defendant was engaged in a conspiracy to murder Fischer and that there was a community of unlawful purpose between the defendants when they killed Officer Ridges. Defendant stated that Annerino paid him money to arrange for Fischer's murder, and that the purpose of going out to Fischer's house was to kill him. Defendant also stated that they drove away from Fischer's house because they saw Officer Ridges' car in front of Fischer's house. Defendant further stated that Coulter cocked his gun as they were approached by Officer Ridges. Calvin and Lindsey testified that defendant and Falls offered them money to shoot Fischer, and they each went out to Fischer's house on separate occasions with the intent to shoot Fischer. Defendant does not contest his conspiracy conviction. Upon viewing the evidence in the light most favorable to the prosecution, the jury could have found beyond a reasonable doubt that defendant was accountable for the murder of Officer Ridges.

For the above reasons, the judgment of the trial court is affirmed.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.