THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DWAYNE COULTER, Defendant-Appellant.

First District (1st Division)   No. 1—87—3175

Opinion filed March 16, 1992.—Rehearing denied June 25, 1992.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and William P. Pistorius, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Dwayne Coulter was convicted of the murder of Michael Ridges

and conspiracy to murder Robert Fischer. Defendant was sentenced to natural life imprisonment. For the following reasons, we affirm.

The record on appeal indicates the following facts. Defendant, Allen Falls, Ira Jackson and John Annerino were charged with murder and conspiracy to commit murder. Prior to a hearing on defendant's fitness to stand trial, the State found out that defendant had been examined by two experts, Drs. Conroe and Hemmerich. The court ordered defendant to turn over two documents relating to defendant's fitness prepared by Dr. Hemmerich and one report prepared by Dr. Conroe, along with notes from Dr. Conroe's second examination of defendant.

At the fitness hearing, the State called Dr. Kaplan, who testified that defendant was fit to stand trial. Following Dr. Kaplan's testimony, the jury was sent from the room. The court allowed the State to conduct a *voir dire* of Dr. Hemmerich. The State had subpoenaed Dr. Hemmerich earlier that morning because defendant did not intend to have him testify at the hearing. Dr. Hemmerich opined that defendant was fit to stand trial.

When the jury returned, defendant called Dr. Conroe, who testified that defendant was unfit to stand trial. On cross-examination, Dr. Conroe admitted that before his second examination of defendant, he had seen Dr. Hemmerich's second report to the contrary. The jury found defendant fit to stand trial.

Before trial, the court denied defendant's motion to sever the charges against him. Defendant's answer to discovery listed insanity as a possible defense and listed witnesses defendant might call at trial. The State moved to bar expert testimony on the insanity defense because defendant refused to cooperate with a court-ordered examination and there were no reports bearing on the insanity defense. Defense counsel replied that the potential witnesses had been listed and the relevant reports had been disclosed. The court directed that subpoenas issue for Drs. Conroe and Hemmerich.

The following day, the State reported that Dr. Conroe had stated by phone that he had no reports on sanity. Dr. Hemmerich refused to speak to the State and was served with the subpoena. The State asserted that it had a right to know which of the doctors listed by defendant might testify on the insanity defense. The court ordered defense counsel to so specify and jailed defense counsel when he refused to do so. Later, Dr. Hemmerich testified that he had an opinion on defendant's sanity, but it was not in writing. The court ruled that Dr. Hemmerich would provide a written summary of his opinion or he would be barred from testifying at trial.

Later, defendant moved to substitute judges before another judge. After a hearing, the motion was denied and the case was transferred back to the original trial judge.

At the outset of the jury selection process, the trial court stated that both sides would be required to give reasons for their peremptory challenges. After the first panel of venirepersons was questioned on *voir dire*, defendant moved for a mistrial because the State had exercised its first six peremptory challenges to exclude African-Americans from the jury. The trial court denied not only this motion, but also two subsequent motions for mistrial claiming discriminatory jury selection.

The following evidence was adduced at trial. In August 1984, Robert Fischer became the friend of John Annerino, an official in the clerk's office for the City of Chicago. Fischer moved in with Annerino, becoming the pastor of a church which Annerino ran from the basement of his home. As pastor, Fischer had access to church assets in excess of $500,000. Annerino supplied Fischer with a luxury car paid for by church funds, as well as a job at the clerk's office.

Later, the two men had a falling out; Annerino told Fischer "that there was only one way that [Fischer] would ever leave that house or his church, and that would be in a coffin." Fischer moved into his mother's house in Prospect Heights on June 30, 1985. Fischer lost his job the next day. Annerino filed, then dropped, a criminal charge against Fischer; both men filed suit over room, board and possession of Fischer's personal effects.

In August 1985, a brick was thrown through the picture window of Fischer's home. Fischer later received a death threat by telephone. On October 5, 1985, someone shot at Fischer as he left his job at a bar. Steve Calvin testified that on October 14, 1985, he spoke with Ira Jackson and Allen Falls, the latter offering him money to kill Fischer for Annerino. Bobby Lindsey also testified that Falls offered him money to kill Fischer.

On October 15, Lindsey spoke to Falls in front of defendant. Lindsey first drove Falls and defendant to Annerino's house; later they went to Fischer's home. Falls told Lindsey to shoot Fischer. Lindsey was given a .22 revolver and was shown Fischer's picture. Fischer's mother answered the door and told Lindsey, who claimed he had car trouble, that Fischer was not home. The three men left.

On October 16, 1985, Lindsey, Falls, Jackson, Calvin and defendant drove to Fischer's home. Falls gave Calvin a .22 caliber gun and defendant gave Lindsey a .357 caliber gun. The five men left after hearing that Fischer was not at home again. Later that day, Fischer

received a phone call from a man purporting to be a Chicago police officer. The man claimed to have a warrant for Fischer's arrest. The man stated that he would be at Fischer's house the next morning at 9:30 a.m., and Fischer should be home. Fischer called the Prospect Heights police department and spoke with Officer Michael Ridges.

On October 17, 1985, Officer Ridges arrived at Fischer's home at 9 a.m., where the two men spoke for about 10 minutes. Officer Ridges wrote a report and left. Minutes later, near the intersection of Willow and Elmhurst Roads, Officer Ridges effected a traffic stop of a blue Cadillac without license plates. In the car were Falls, Jackson and defendant.

Officer Lussky, who heard Ridges call in the traffic stop, heard a call minutes later of an officer shot at the same location. At the scene, Lussky found Ridges on the ground with an injury to his chin and a fatal bullet wound to the head. He also found Falls' driver's license near Ridges. Officer Kucharski, hearing of the shooting, spotted the blue Cadillac on the Kennedy Expressway, called for a wagon and pulled the car over. Falls, Jackson and defendant were ordered out of the car. Defendant wore an outfit strongly resembling a Chicago police uniform. A pistol, badge and police scanner were in plain view in the car.

Officer Tabuka, searching defendant, found a .38 caliber pistol with two spent cartridges and four live shells. Later testing showed that the bullet which killed Ridges came from this gun and showed gunpowder residue on defendant's hands. Officer Harder testified that he noticed nothing unusual about defendant's behavior at the time of arrest. Officer Smith testified that defendant seemed rational when arrested, but admitted that he had testified before that defendant did not seem rational.

Defendant testified that on October 17, 1985, he, Falls and Falls' cousin drove to Des Plaines to look for a job in a mall. They were lost when they were pulled over by the police. The officer asked to see Falls' license. The men got out of the car. The officer asked if defendant had a gun; defendant said he did. Defendant testified he was angry that Ridges did not believe he was a security guard, and the gun went off accidentally after he slammed it down on the hood of the Cadillac. The three men fled in panic when Ridges was shot. Later testing failed to show marks or powder burns on the hood of the car.

Dr. Hemmerich testified that defendant was insane at the time of the shooting. Dr. Kaplan testified that defendant was not suffering from a mental illness at the time of the offense.

Following closing arguments, the jury found defendant guilty of murdering Ridges and conspiring to murder Fischer. The jury declined to impose the death penalty. Defendant was sentenced to natural life imprisonment and appealed to this court.

# I

Defendant first argues that the trial court erred in failing to sever the charges against him. Joinder of prosecutions is permitted when the charges are "based on the same act or on 2 or more acts which are part of the same basic transaction." (Ill. Rev. Stat. 1987, ch. 38, pars. 111—4(a), 114—7.) Although there are no precise factors which determine whether offenses are part of the same comprehensive transaction, important factors include: the proximity of the offenses in time and location; the identity of evidence needed to link the offenses; whether the offenses shared a common method; and whether the same or similar evidence would establish the elements of the offenses. (*People v. Duncan* (1987), 115 Ill. 2d 429, 441, 505 N.E.2d 307, 312, *vacated on other grounds* (1987), 484 U.S. 806, 98 L. Ed. 2d 18, 108 S. Ct. 53.) The decision to sever charges rests within the discretion of the trial court. *People v. Mays* (1988), 176 Ill. App. 3d 1027, 1037, 532 N.E.2d 843, 849.

The record indicates that Ridges was shot by defendant "a country block and a half" from Fischer's home. Ridges stopped the car in which defendant was a passenger approximately 10 minutes after taking a report at Fischer's home concerning a suspicious phone call from an alleged Chicago police officer, as well as events implying that someone was seeking to kill Fischer. Evidence that defendant was acting in furtherance of a conspiracy, including not only the police gear worn by defendant and found in the car, but also slips of paper found on the defendant indicating the names and phone numbers of Annerino and Fischer's mother, was introduced to help establish the element of intent necessary to prove murder. The record therefore supports the trial court's discretion to deny severance in this case.

The cases cited by defendant are distinguishable. In *People v. Olson* (1978), 59 Ill. App. 3d 643, 375 N.E.2d 533, this court affirmed the trial court's refusal to join charges. (*Olson*, 59 Ill. App. 3d at 649, 375 N.E.2d at 538.) In *People v. Fleming* (1970), 121 Ill. App. 2d 97, 257 N.E.2d 271, the felonies were committed eight months apart. (*Fleming*, 121 Ill. App. 2d at 102, 257 N.E.2d at 273.) In *People v. Edwards* (1976), 63 Ill. 2d 134, 345 N.E.2d 496, the jury heard evidence of an unrelated prior felony conviction, which created a significant risk that the jury would unfairly infer that the defendant had a

propensity to commit crimes. (See *Edwards*, 63 Ill. 2d at 139-40, 345 N.E.2d at 498.) Here, there was no introduction of unrelated prior convictions; thus, defendant has failed to show error in this case.

## II

Defendant's next argument on appeal is that the trial court erred in instructing the jury at the fitness hearing that defendant was presumed fit. In his post-trial motion, defendant simply alleges that the "[t]rial court refused defense instruction at trial and during fitness proceedings," which is too vague to preserve the issue. *People v. Harris* (1986), 146 Ill. App. 3d 632, 636, 497 N.E.2d 177, 179.

■ Even if the argument had been preserved, it is not persuasive. The instruction at issue correctly states the law. (See Ill. Rev. Stat. 1987, ch. 38, par. 104—10.) Defendant notes that the instruction did not tell the jury that the presumption of fitness vanishes once a *bona fide* doubt as to his fitness is raised. The record, however, indicates that the jury was instructed that the State had to prove defendant's fitness by a preponderance of the evidence. Hence, the mention of the presumption was not reversible error. *People v. Young* (1978), 60 Ill. App. 3d 351, 355-56, 376 N.E.2d 739, 742.[1]

## III

Defendant's third argument is that the trial court erred by orally instructing the fitness jury that defendant need only have the opportunity, rather than the ability, to assist counsel in his defense. The written instruction stated the proper standard, but defendant contends that the written instruction cannot cure the improper oral instruction.

■ The cases cited by defendant on this point involved the submission of contradictory written instructions. (*People v. Haywood* (1980), 82 Ill. 2d 540, 545, 413 N.E.2d 410, 413; *People v. Jenkins* (1977), 69 Ill. 2d 61, 64-65, 370 N.E.2d 532, 534.) This case involves a misread oral instruction, which does not require reversal because the proper written instruction was submitted. See *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098.

---

[1]We note that the *Young* court cited *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, which defendant sought to distinguish in this appeal. However, *Young* is merely a specific reflection of the more general rule that imperfect jury instructions do not require a reversal where, taken as a whole, they fairly inform the jury of the applicable law, including the burden of proof. See, *e.g., People v. Hartfield* (1985), 137 Ill. App. 3d 679, 484 N.E.2d 1136.

IV

Defendant's fourth argument is that his fifth amendment privilege under the United States Constitution was violated by requiring defendant to disclose one of two reports prepared by Dr. Hemmerich, because defendant did not intend to call him as a witness or use his report at the fitness hearing. Defendant raised the issue of privilege at the hearing, but failed to argue or cite authority on that issue on appeal, thus waiving it. *People v. Hoffmann* (1986), 140 Ill. App. 3d 1056, 489 N.E.2d 460.

■ The constitutionality of admitting psychiatric reports in judicial proceedings has been considered by the United States Supreme Court. In *Buchanan v. Kentucky* (1987), 483 U.S. 402, 97 L. Ed. 2d 336, 107 S. Ct. 2906, the Court stated that "if a defendant requests such an evaluation *or presents psychiatric evidence*, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." (Emphasis added.) *Buchanan*, 483 U.S. at 422-23, 97 L. Ed. 2d at 355, 107 S. Ct. at 2917-18; see also *Estelle v. Smith* (1981), 451 U.S. 454, 465, 68 L. Ed. 2d 359, 370, 101 S. Ct. 1866, 1874.

■ The record does not indicate that Dr. Hemmerich's examination was forced upon defendant by the trial court or the State. Although defendant did not intend to call Dr. Hemmerich or rely on his report at the fitness hearing, defendant did intend to present psychiatric evidence from Dr. Conroe. Moreover, the record shows that Dr. Conroe had reviewed the report at issue before his second examination of defendant. Thus, this case falls within the scope of *Buchanan* and *Estelle*.

Defendant argues that *Buchanan* and *Estelle* are inapposite because they deal with admissibility rather than discoverability. Yet the scope of discovery includes not only what is admissible at trial, but also that which leads to what is admissible at trial. *Mistler v. Mancini* (1982), 111 Ill. App. 3d 228, 232, 443 N.E.2d 1125, 1128.

Defendant relies on *People ex rel. Bowman v. Woodward* (1976), 63 Ill. 2d 382, 349 N.E.2d 57, in which the State's discovery request would have required defendant to reveal his knowledge of whether various examinations or tests had been performed on him, the names of any persons who conducted such tests and the results of those tests. (*Bowman*, 63 Ill. 2d at 386, 349 N.E.2d at 59.) By contrast, this case involves the results of a known report prepared by a known expert. Moreover, *Bowman* did not purport to overrule *People v. Williams* (1967), 38 Ill. 2d 115, 121, 230 N.E.2d 224, 228, which held that

reports relating only to defendant's mental state do not raise a fifth amendment issue. Defendant has failed to show that the reports contained incriminating statements made by defendant. Finally, we note that *Bowman* predates *Estelle* and *Buchanan.*

## V

■ Defendant's fifth argument is that the State's closing argument at the fitness hearing improperly used hearsay statements of experts as substantive evidence, shifted the burden of proving fitness to defendant, and improperly insinuated that Dr. Conroe was lying. Objections to closing arguments must be made at trial to be preserved on appeal. (*Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 173, 443 N.E.2d 774, 777.) The record here does not show objections to the allegedly improper use of hearsay or shifting the burden of proof, thus waiving these issues.

The contention that the State improperly asserted that Dr. Conroe lied at the fitness hearing because he was paid by defendant was preserved for appeal, but is unavailing for two reasons. First, the record shows that the argument was made in response to defendant's closing argument that Dr. Conroe had staked his reputation on his opinion. Arguments made in response to like comments of opposing counsel do not require reversal. (*E.g., Crutchfield v. Meyer* (1953), 414 Ill. 210, 111 N.E.2d 142.) Second, it is not improper *per se* to comment on the compensation a witness may receive, so long as such compensation is in evidence or may be inferred from the evidence. (See *Hunter*, 111 Ill. App. 3d at 172, 443 N.E.2d at 777.) Here, the record indicates that Dr. Conroe was a paid witness for defendant and had a record of testifying for criminal defendants. Defendant has failed to show that the State abusively alleged an illegitimate relationship between the witness and defense counsel. *Hunter*, 111 Ill. App. 3d at 175, 443 N.E.2d at 778.

## VI

Next, defendant argues that the trial court improperly ruled that his expert witness could not testify at trial unless he submitted a written report or summary of his opinion of defendant's sanity. Defendant also argues that unfair prejudice resulted because the State cross-examined Dr. Hemmerich on the fact that the report was prepared the day before trial. Defense counsel must furnish the State with the defenses he intends to make, along with the names and last known addresses of persons he or she intends to call as witnesses together with their relevant written or recorded statements, including

memoranda reporting or summarizing their oral statements. (134 Ill. 2d R. 413(d)(i).) The court may also order additional disclosure of relevant and material information. 134 Ill. 2d R. 415(e).

In this case, the State moved to bar expert testimony on the insanity defense at trial because defendant had refused to cooperate with a court-ordered mental examination; the record suggests that the motion could have been granted. (See Ill. Rev. Stat. 1987, ch. 38, par. 104—14(a).) Instead, the testimony was to be barred because defendant had not submitted any reports relating to the insanity defense. However, there is generally no requirement that a witness reduce his opinion to writing before testifying at trial, absent a showing of bad faith. (*People v. Fleming* (1987), 155 Ill. App. 3d 29, 40, 507 N.E.2d 954, 961.) Nor has the State cited authority for the proposition that defendant must specify which witnesses may testify on a particular issue.

In this case, the State has not suggested bad faith; thus, the order was erroneous. However, defense counsel's redirect examination remedied any prejudice defendant may have suffered by eliciting testimony that Dr. Hemmerich had an opinion before committing it to paper. The use of a court-ordered summary to impeach an expert is harmless error where, as here, the evidence of defendant's guilt is not closely balanced. See *Fleming*, 155 Ill. App. 3d at 40-41, 507 N.E.2d at 961.

## VII

Defendant's seventh argument is that his motion for substitution of judges was wrongfully denied. A defendant is entitled to a new trial where the trial court's remarks, taken as a whole, exhibit a hostility toward defense counsel and defendant. *People v. Pressley* (1987), 160 Ill. App. 3d 858, 513 N.E.2d 921.

The record indicates that the trial court referred to defense counsel in an unflattering way on numerous occasions, but defendant has failed to point to any incident where the trial court was hostile towards defendant himself. (See *Pressley*, 160 Ill. App. 3d at 865, 513 N.E.2d at 926.) Nor does defendant point to any instance where the trial court made hostile comments in the presence of the jury. Indeed, the record reflects that in finding defense counsel in contempt[2], the trial court delayed acting upon this finding on the chance that it

---

[2]The trial court's contempt order is the subject of a separate appeal before this court. See *People v. Coulter* (1992), 228 Ill. App. 3d 1014.

might be reported in the media, where a juror might read of it. In addition, the record shows that this case, unlike *Pressley*, was not a close one. (See *Pressley*, 160 Ill. App. 3d at 865, 513 N.E.2d at 926.) Therefore, defendant has not shown the motion was improperly denied, given the record on appeal.

## VIII

Defendant argues that the State purposefully discriminated against African-Americans during jury selection, in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. This court, after hearing oral argument on October 9, 1990, issued an order remanding the case to the circuit court for clarification of the record concerning the jury selection procedure and for any necessary further proceedings, pursuant to *People v. Hope* (1990), 137 Ill. 2d 430, 560 N.E.2d 849, *vacated* (1991), 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792, yet retaining jurisdiction over the appeal pending completion of the supplemental hearing and the submission of supplemental briefs and oral argument on the *Batson* issue, pursuant to *People v. Garrett* (1990), 139 Ill. 2d 189, 194-95, 564 N.E.2d 784, 787.

## A

On appeal, defendant contends that this case must be remanded again for a procedurally correct hearing, pursuant to *Hope*. In that case, our supreme court stated that the procedure to be followed when jury selection is challenged under *Batson* cannot be collapsed into an undifferentiated review of defendant's contentions and the State's rebuttal explanations. (*Hope*, 137 Ill. 2d at 456, 560 N.E.2d at 860.) In this case, the trial court initially required both parties to give explanations for its peremptory challenges from the very start of *voir dire*, requiring this court to remand pursuant to *Hope*.

The record on remand indicates the following facts. The trial court stated that although it denied the *Batson* motion before trial, it had not fully explained its reasoning. The trial court nevertheless would afford defense counsel with the opportunity to supplement the record on this issue. Defense counsel noted that defendant was an African-American accused of murdering a white police officer. Defense counsel further stated that the State used 9 of its 10 peremptory challenges to exclude African-Americans from the jury. The State replied that numbers do not make a *prima facie* case of discrimination. Defense counsel responded that the excused venirepersons were heterogeneous, sharing race as their sole common characteristic. The trial court found that, based on the record presented, defendant had not

made a *prima facie* case of discrimination. The trial court also found that had defendant made a *prima facie* case, the State had offered race-neutral reasons for its challenges. Defendant's motion to reconsider was denied.

It appears that the procedure followed was less than ideal, for the record suggests that defendant was unable to attack the reasons offered by the State until the hearing on defendant's motion to reconsider. Moreover, the record indicates that the trial court exhibited an open hostility toward defense counsel in this capital case—hostility that does not find justification in this record. Nevertheless, defense counsel's responses to the State's reasons were heard by the trial court during defendant's motion to reconsider. The record therefore does not suggest that the trial court's hostility amounted to a prejudgment of the issue on remand. As the parties have twice marshalled the evidence on this issue and provided this court with factual submissions and judicial findings sufficient for review, it is unnecessary to remand the cause a second time. (*Hope*, 137 Ill. 2d at 461, 560 N.E.2d at 863.) We therefore turn to the merits.

## B

Under *Batson* and its progeny, a defendant must first establish a *prima facie* case of purposeful racial discrimination in jury selection by showing that the State exercised its peremptory challenges to remove members of a cognizable racial group from the venire. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723; see also *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (defendant need not be member of cognizable racial group, but defendant's racial identity may be relevant to determination of *prima facie* case).) The only question which then remains is whether considering "all relevant circumstances," a *prima facie* case of discrimination has been established. (*Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 412-13, 539 N.E.2d 1172, 1184.) "Relevant circumstances" include, but are not limited to: (1) a pattern of strikes against African-American venire members; (2) disproportionate use of strikes against such members; (3) whether the excluded venirepersons were a heterogeneous group sharing race as their only common characteristic; (4) the level of African-American representation in the venire as compared to the jury; (5) prosecutorial questions and statements during *voir dire* and while exercising challenges; and (6) the races of defendant and victim or witnesses. (*Garrett*, 139 Ill. 2d at 203, 564 N.E.2d at 791; *Hope*, 137 Ill. 2d at 453, 560 N.E.2d at 859; *People v. Evans* (1988),

125 Ill. 2d 50, 63-64, 530 N.E.2d 1360, 1365.) The trial court's determination of whether a *prima facie* case of discrimination has been shown will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Hope*, 137 Ill. 2d at 461-62, 560 N.E.2d at 863.

Our supreme court has cautioned trial courts against collapsing what ought to be a methodical *Batson* hearing procedure into an undifferentiated review of defense and State contentions. (*Garrett*, 139 Ill. 2d at 201, 564 N.E.2d at 789-90; *Hope*, 137 Ill. 2d at 456, 560 N.E.2d at 860.) Conversely, the court has also cautioned trial courts against omitting the first step in the *Batson* analysis altogether by requiring the State to give reasons for its challenges without regard to whether it is warranted by the record. *People v. Jackson* (1991), 145 Ill. 2d 43, 98, 582 N.E.2d 125, 151.

■■■ Initially, defendant argues that because the State offered race-neutral explanations for its peremptory challenges and the trial court ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot. (*Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.) However, *Hernandez* applies where the State defends its peremptory challenges *without* the prompting of the trial court, not in cases where the trial court forces the State to provide reasons before any *Batson* issue arises. (See *Jackson*, 145 Ill. 2d at 101, 582 N.E.2d at 152.) The record shows that this case falls in the latter category; thus, the issue of whether defendant made a *prima facie* case is not moot.

We therefore turn to the question of whether defendant made a *prima facie* case of discriminatory jury selection. The record indicates that the State used 9 of 10 peremptory challenges (90%) to exclude African-Americans and that its first six peremptories were so used, suggesting a pattern of strikes against minority venirepersons and a disproportionate use of strikes against minority venirepersons.

Moreover, as in *Hope*, this case involves an African-American defendant charged with the murder of a Caucasian police officer. (See *Hope*, 137 Ill. 2d at 464, 560 N.E.2d at 864.) As noted above, the races of the defendant and victim are relevant circumstances which weigh here in favor of finding that defendant made a *prima facie* case of discrimination.

Furthermore, the record indicates that the excluded venirepersons were heterogeneous, sharing race as their only common characteristic. The record shows that of the excluded venirepersons, some were employed and some were not. The employed venirepersons worked as

a nurse, a post office worker, a district trainer for "7-11" stores, a linen company employee and a salesperson. The other challenged venirepeople were unemployed for various reasons: one was a student; one was not employed outside the home because she was a mother and homemaker; one was laid off from his job; and one was on social security due to an asthma condition. The excluded members had been employed or unemployed for various lengths of time. The group ranged in age from 21 to 54 years old. Five of the excluded venirepersons were female; four were male. At least five of the group were single; at least one was currently married. Some of the excluded group indicated that they had children; others did not so indicate. Some indicated that they or members of their families had been victims of crime; others did not. The excluded persons lived at their current addresses from 2 to 24 years.

The presence of a pattern or disproportionate use of strikes against a group of otherwise heterogeneous minority venirepersons typically results in a finding that a *prima facie* case has been made. See *People v. Kindelan* (1991), 213 Ill. App. 3d 548, 553, 572 N.E.2d 1138, 1141 (and cases cited therein); *People v. Lockhart* (1990), 201 Ill. App. 3d 700, 711, 558 N.E.2d 1345, 1352.

The State responds that 16 of the 55 persons comprising the panel from which the jury was selected were African-American (roughly 29%) and that three African-Americans sat on defendant's jury (25%). Nevertheless, evidence of pattern or disproportionate use of strikes against an otherwise diverse group of minority venirepersons is not always offset by evidence that the percentage of African-Americans on the jury was identical to the percentage in the venire. (*Kindelan*, 213 Ill. App. 3d at 554, 572 N.E.2d at 1141-42.) Indeed, in this case, the record indicates that the percentage of minority jurors is less than the percentage of minority venirepersons.

The State also argues that the trial judge properly considered the reasons it required the State to supply in finding that no *prima facie* showing had been made. In a given case, the State might offer truly contemporaneous explanations which would be relevant to the determination of the *prima facie* case, but such explanations might nevertheless be outweighed by the totality of the circumstances. (*Hope*, 137 Ill. 2d at 460, 560 N.E.2d at 862.) Given the circumstances here, it appears that a *prima facie* case was made; under our case law, the trial court's contrary finding was against the manifest weight of the evidence.

## C

■ Accordingly, the burden shifts to the State to come forward with clear, reasonably specific, legitimate and race-neutral explanations for striking the venirepersons. (*Hope,* 137 Ill. 2d at 453, 560 N.E.2d at 865; see *Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Such explanations need only be subjectively neutral (*People v. Jones* (1990), 201 Ill. App. 3d 440, 448, 559 N.E.2d 112, 118), and need not rise to the level justifying a challenge for cause, but a mere assertion of good faith or nondiscriminatory motive is insufficient. (*People v. Harris* (1989), 129 Ill. 2d 123, 174, 544 N.E.2d 357, 379.) The trial court must make a sincere, reasoned assessment of the genuineness of the proffered explanations. (*People v. Baisten* (1990), 203 Ill. App. 3d 64, 77, 560 N.E.2d 1060, 1068.) Whether the *prima facie* case has been rebutted is a factual question grounded in credibility; thus, the trial court's decision is entitled to great deference and will not be reversed unless it is against the manifest weight of the evidence. (*Hope,* 137 Ill. 2d at 467, 560 N.E.2d at 866; *Harris,* 129 Ill. 2d at 175, 544 N.E.2d at 380.) Because the exclusion of even one venireperson on the basis of race requires reversal of defendant's conviction (*People v. McDonald* (1988), 125 Ill. 2d 182, 200-01, 530 N.E.2d 1351, 1359), the State's explanation for peremptorily excluding each African-American venireperson will be reviewed. (*Kindelan,* 213 Ill. App. 3d at 555, 572 N.E.2d at 1142.) When the original prosecutors are not involved on remand, speculative, *ex post facto* explanations do not meet the requirements of a *Batson* hearing (*People v. Johnson* (1990), 199 Ill. App. 3d 798, 806, 557 N.E.2d 565, 569); we therefore turn to consider the reasons proffered by the State during the original *voir dire.*

*Edward Terry*—The State asked to exclude Terry because he indicated he had some problems with the fact that defendant could be sentenced to death. The State conceded that Terry's responses did not justify a challenge for cause pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, but argued that a peremptory challenge was permissible. Our supreme court, in *Jackson,* affirmed a trial court finding that the State's explanations were neutral where one reason offered for exclusion was a venireperson's reaction to the possibility of a death sentence (see *Jackson,* 145 Ill. 2d at 100, 582 N.E.2d at 151), though the court did not rely on that explanation (see *Jackson,* 145 Ill. 2d at 102, 582 N.E.2d at 152). As the State's reasons do not need to rise to the level of a challenge

for cause, apprehension over the possibility of a death sentence may be deemed a proper reason for excluding Terry.

*Anthony Powe and Kevin Archibald*—The State explained that Powe had previously been charged with theft in 1985 and had not admitted this to the trial court when asked. The State had sought to exclude Archibald for cause, noting a civil suit filed against him and also stating that he had been charged with theft in 1985. The failure to admit the prior criminal charge appears to be a sufficient race-neutral reason for exclusion. (*People v. Murff* (1991), 214 Ill. App. 3d 1034, 1040, 574 N.E.2d 815, 819.) Defendant contends that the State's reliance on the theft charges is pretextual because the State accepted a Hispanic venireperson named Martinez who had been charged with burglary. Although the trial court must consider the extent to which excluded minority venirepersons possessed the same characteristics as accepted nonminority venirepersons in assessing the legitimacy of the State's explanations, an excluded venireperson may also lack or possess an additional characteristic which explains the exclusion. (*Harris*, 129 Ill. 2d at 179-80, 544 N.E.2d at 382.) In this case, the record indicates that Archibald did not respond when the trial court asked him whether he had ever been criminally charged. In contrast, Martinez discussed his charge when asked.

*Marcina Adams*—The State explained that it wished to exclude Adams because she was a licensed practical nurse. The State did not want her as a juror where medical testimony on the insanity defense was to be presented. The State's concern over the employment status and positions of venirepersons can be legitimate and race-neutral. *People v. Mack* (1989), 128 Ill. 2d 231, 241, 538 N.E.2d 1107, 1112; *cf. Bass v. State* (Ala. Crim. App. 1991), 585 So. 2d 225, 237 (excluding nurse with a relative who had suffered a nervous breakdown).

Defendant argues that Adams merely had one year of training and worked with the elderly. Defendant contends that there was no evidence that Adams came into contact with mental health experts or had greater knowledge in the area of mental health than a layperson. Defendant adds that if the State were concerned about such knowledge, all venirepersons should have been asked whether they had ever taken any courses in the mental health field.

An explanation which rests upon a lack of information about a venireperson must be closely scrutinized to insure that the reason is not pretextual, including consideration of whether the State attempted to discover the information through supplemental questions. (*Harris*, 129 Ill. 2d at 188, 544 N.E.2d at 386; *Kindelan*, 213 Ill. App. 3d at 558, 572 N.E.2d at 1144.) *Harris* and *Kindelan*, however, deal

with peremptory challenges based on a lack of information about a venireperson; here, the State had information about Adams upon which it based its challenge. Defendant cites no authority for the proposition that the State had to inquire into Adams' specific knowledge of psychology or psychiatry to sustain its burden. As to the failure to ask others about their knowledge of psychology and psychiatry, we note that *Harris* and *Kindelan* concern the State's failure to request that supplemental questions be asked of the excluded venireperson, not others who were or were not excluded.

*April Rhem*—The State sought to exclude Rhem on the basis of her employment record. Rhem had last worked at a temporary employment service for two months. Previously, she had worked as an accounting clerk for seven months, a sales clerk for four months and a general office worker for three months.

Defendant argues that the explanation in Rhem's case was pretextual because Rhem's employment record is consistent with her status as a student. However, the State's concern with the employment status of venirepersons may extend to those who are students. (See *Evans*, 125 Ill. 2d at 65, 530 N.E.2d at 1366.) Moreover, as the State notes, one of the alternate jurors accepted by the State was an African-American student, suggesting that race was not the motivating factor in this instance. In addition, we note that one juror identified by defendant as unemployed was retired, a situation which may be distinguishable from the venirepersons challenged by the State in this case.

*Teresa Brantley*—The State explained that it wished to exclude Brantley because she had been unemployed for 10 years. Defendant contends that this is a pretextual explanation because Brantley was acting as a mother and homemaker while her daughter was in grade school. Defendant does not cite to the record in support of this characterization. Moreover, defendant has failed to cite authority in support of the argument that a single mother or homemaker such as Brantley cannot be excluded on that basis. (*Cf. State v. Guillory* (La. App. 1989), 544 So. 2d 643, 650-51 (affirming exclusion based on State's concern over the "moral implications" of persons who are unwed mothers); *United States v. Williams* (7th Cir. 1991), 934 F.2d 847, 850 (affirming exclusion based on prosecutor's assumption that a single mother might not give her full attention to the trial).) Thus, it seems that deference to the trial court ruling in this respect is warranted.

*Jeanell Hicks*—The trial court accepted the State's explanation that Hicks was excluded because she seemed timid and hesitant in an-

swering the trial court's questions. Defendant contends that the explanation is pretextual. Explanations which focus on a person's body language or demeanor must be closely scrutinized because they can easily be used as a pretext for discrimination. (*Harris*, 129 Ill. 2d at 176, 544 N.E.2d at 380.) Nevertheless, hesitancy in answering a question during *voir dire* may be a race-neutral reason for exercising a peremptory challenge. (*People v. Young* (1989), 128 Ill. 2d at 19-21, 538 N.E.2d at 456-57.) Given the great deference accorded to the trial court's ruling, which is based largely on an assessment of the State's credibility, we cannot say that the trial court's ruling was clearly erroneous.

*Melvin Igess*—The State based its peremptory challenge on two grounds. First, the State relied upon Igess' paternity of children by two different women. Second, the State relied upon Igess' employment record.

Defendant responds that these reasons are pretextual. Defendant argues that the State did not challenge 22-year-old John Votanek, who was also unemployed at the time of *voir dire* and purportedly had a similar record of prior employment. Defendant also argued on remand that none of the nonminority veniremen were asked about their paternity of children, including Randy Fone, who was divorced with a child aged seven months.

Upon close scrutiny of the record, we cannot say that the trial court's finding was clearly erroneous. The trial court could have concluded that the paternity factor, when combined with the employment record, justified a peremptory challenge. As noted above, a venireperson may be similar in one respect to an accepted juror, yet possess a characteristic which justifies a peremptory challenge based on the totality of the circumstances. In this case, defendant has failed to demonstrate that either Votanek or Fone was similar to Igess as to both employment and paternity. Thus, a peremptory challenge against a person with both characteristics could be justified. Moreover, as mentioned in discussing venireperson Adams, *Harris* and *Kindelan* do not require the State to ask similar questions on all issues of all venirepersons.

*Melanie Pinkins*—The State sought to exclude Pinkins because her mother worked at Mercy Hospital, where Dr. Hemmerich (who was named as a possible defense witness) spent between five and six years of his career. Defendant argues that this explanation is pretextual, but the State's explanation may be fairly read as a concern that Pinkins might give more credibility to Dr. Hemmerich because he

had worked at the same hospital as her mother. The same could not be said of any of the accepted venirepersons.

In sum, defendant has failed to demonstrate from the record that the trial court's determination of no intentional discrimination was clearly erroneous.

## IX

Defendant next argues that the trial court erred by refusing to give defendant's non-Illinois Pattern Jury Instruction (IPI) concerning the use of prior inconsistent statements. Defendant argues that the instruction given to the jury (Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981)), which provides that prior inconsistent statements may be used only for deciding the weight of a witness' courtroom testimony, is inaccurate in light of section 115—10.1 of the Code of Criminal Procedure of 1963, which provides that a witness' prior inconsistent statement, written or signed by the witness, which describes an event or condition of which the witness had personal knowledge, is admissible as substantive evidence. (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1(c)(2)(A).) Defendant argues that the jury should have been instructed such that a statement from Officer Smith's police report that defendant appeared irrational at the time of his arrest and a signed statement by Bobby Lindsey concerning the time he was to have met the other alleged conspirators on October 16 could be considered as substantive evidence.

IPI criminal instructions are preferred to non-IPI instructions where the instructions give due consideration to the applicable law. (134 Ill. 2d R. 451(a).) The IPI instruction at issue here has been described by this court as "inaccurate and unduly restrictive" following the passage of section 115—10.1. (*People v. Wilson* (1986), 149 Ill. App. 3d 1075, 1078, 501 N.E.2d 863, 865.) Nevertheless, one inaccurate instruction does not mandate a reversal *per se*. (*People v. Vanda* (1982), 111 Ill. App. 3d 551, 569, 444 N.E.2d 609, 622.) Based on this record, the refusal to issue defendant's instruction did not amount to reversible error.

## X

Finally, defendant argues that he was denied a fair trial due to the State's comments during closing arguments. Objections to closing arguments must be made at trial to be preserved for review. (*People v. Berry* (1984), 99 Ill. 2d 499, 503, 460 N.E.2d 742, 743-44.) The record shows no objection to many of the comments raised here; objections to those comments are waived.

■ Of those comments remaining, the record does not support reversal. Attorneys are granted considerable leeway in their closing arguments; the trial court is accorded every reasonable presumption in the exercise of its discretion. *E.g., People v. Simms* (1988), 121 Ill. 2d 259, 269, 520 N.E.2d 308, 312.

In argument, the State attacked the honesty of defendant's expert witness. An attorney cannot insinuate that a witness is untruthful because he is paid by the opposing party (see *People v. Frazier* (1982), 107 Ill. App. 3d 1096, 1102, 438 N.E.2d 623, 627), but comments similar to those at issue here have been held to be permissible argument on the expert's credibility. (*People v. Bibbs* (1981), 101 Ill. App. 3d 892, 897, 428 N.E.2d 965, 969.) Thus, defendant has not shown an abuse of discretion.

The prosecutor's comment that he and co-counsel had fulfilled their responsibility to present evidence of guilt beyond a reasonable doubt merely explained the prosecutor's role at trial and did not attempt to put the authority of the State behind the prosecutor's personal opinion. (See *People v. Clark* (1987), 160 Ill. App. 3d 877, 887, 513 N.E.2d 937, 944.) The State's references to the victim's family in this case did not "subject the defendant to extreme prejudice so as to warrant a reversal of his conviction." (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 423, 355 N.E.2d 634, 646.) Moreover, any error in this last regard was cured by the trial court sustaining the objection, as the record supports the jury's verdict. (*E.g., People v. Olivas* (1976), 41 Ill. App. 3d 146, 354 N.E.2d 424.) Finally, defendant has failed to show that the cumulative effect of these comments mandates reversal. Compare *People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275 (reversal), with *People v. Faysom* (1985), 131 Ill. App. 3d 517, 475 N.E.2d 945 (affirmance).

For the aforementioned reasons, the judgment and sentence of the circuit court are affirmed.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.