THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALLEN FALLS, Defendant-Appellant.

First District (1st Division)   No. 1—88—0574

Opinion filed September 7, 1993.

Rita A. Fry, Public Defender, of Chicago (Vicki Rogers, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Michele I. Lavin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Allen Falls was convicted of the murder of Michael Ridges and conspiracy to murder Robert Fischer. Defendant was sentenced to 40 years of imprisonment. This appeal is related to *People v. Coulter* (1992), 230 Ill. App. 3d 209, 594 N.E.2d 1163, and *People v. Jackson* (1992), 233 Ill. App. 3d 1089, 599 N.E.2d 1192. This court granted defendant's motion to substitute the *Coulter* record for this appeal on June 22, 1992.

The record on appeal indicates the following facts. Defendant, Dwayne Coulter, Ira Jackson and John Annerino were charged with murder and conspiracy to commit murder. Annerino died before trial. The trial court granted a severance from Coulter, but ruled that

defendant and Jackson would be tried together before separate juries. The court denied defendant's motion to sever the charges against him.

Before trial, defendant moved to suppress statements he made to the police following his arrest. At a hearing on this motion, Officers Robert Rutherford, John Mahon, Edwin Harder and James Rousell testified that they were present when defendant, Coulter and Jackson were removed from a blue Cadillac on the Kennedy Expressway and placed under arrest. These officers testified that after his arrest, Falls was taken to Northwest Hospital for treatment for a gunshot wound to the leg caused by a codefendant. These officers also testified that defendant was informed of his constitutional rights, but that defendant never indicated that he wished to remain silent or consult with an attorney. The officers further testified that they never saw defendant complain of pain. Officer Rutherford testified that neither he nor anyone in his presence refused to give defendant medication. Officer Mahon testified that the doctor in the emergency room at the hospital told him that defendant's injury was so minor that medication would not be necessary.

Assistant State's Attorney Richard Stock testified that he spoke with defendant at Northwest Hospital. Stock indicated that he also informed defendant of his constitutional rights, but that defendant never indicated that he wished to exercise them. Stock stated that defendant seemed coherent and answered his questions.

Officers Rousell and Harder drove defendant to the Maybrook police station after his treatment at the hospital.

Roberta Samotny, an attorney, testified that on the date in question, she received a telephone call from an attorney named Sam Adams at about 6 p.m. As a result of that call, she and Georgia Perry-Stevens, a paralegal and secretary to Sam Adams, drove to the Maybrook police station. Samotny testified that she arrived at the station at approximately 7 p.m. and told the reception desk she was there to see defendant and Coulter. Samotny testified that she was told to wait and that while waiting, she met Richard Flater, who was there to see Jackson. According to Samotny, she did not see defendant until 7:45 or 7:50 p.m. Defendant asked where she had been and indicated that he had given a statement five minutes earlier.

Georgia Perry-Stevens corroborated much of Samotny's testimony. However, Perry-Stevens stated that they arrived at the station at 6:50 p.m. and were denied access to defendant for 45 minutes to 1½ hours. Perry-Stevens also testified that she thought that Samotny did not see Falls until 9 p.m.

Diane Wiley testified that she was working at the patrol desk at the police station on the evening in question. She remembered Samotny, but did not recall when Samotny arrived. Wiley testified that after Samotny identified herself, she notified her supervisor, who came downstairs and escorted Samotny upstairs within a few minutes.

Lieutenant Arthur Jackson testified that he was the supervising officer on the evening at issue. Lt. Jackson testified that he was first informed that Flater was present in the station. He spoke to Flater. After learning that Flater was there to see his client, Lt. Jackson went upstairs to the investigation section and relayed the message to Captain Frank Braun, who was in charge of the investigation, and Assistant State's Attorney Dennis Dernbach, who was the felony review supervisor for the State's Attorney's office that evening.

Lt. Jackson testified that Braun and Dernbach met Flater downstairs about five minutes later and asked whether they could use an office for a conference. While Braun, Dernbach and Flater were in the office, Lt. Jackson was informed of Samotny's arrival. According to Lt. Jackson, Samotny was escorted into the office with the others no more than five minutes later.

Braun and Dernbach corroborated portions of Lt. Jackson's testimony. They also testified that it was no more than 15 to 20 minutes between the time they went downstairs to the time they accompanied Flater and Samotny upstairs to see their clients.

On surrebuttal, Samotny stated that she did not confer with Braun and Dernbach on the first floor and did not see Dernbach until she arrived on the second floor of the police station.

At the conclusion of the testimony and argument, the trial court denied defendant's suppression motion.

As noted above, defendant and Ira Jackson were tried together before separate juries. The evidence adduced at defendant's trial is substantially the evidence recounted in *Jackson*, which also used the record with the *Coulter* docket number. (See *Jackson*, 233 Ill. App. 3d at 1090-96, 599 N.E.2d at 1194-98.) Thus, the record need only be recounted briefly here.

The record shows that Officer Ridges was found shot to death in Prospect Heights, Illinois, on October 17, 1985. The State presented evidence connecting defendant to John Annerino, Robert Fischer and, ultimately, to Officer Ridges. (See *Jackson*, 233 Ill. App. 3d at 1090, 599 N.E.2d at 1195.) In this appeal, the State and defendant recount the testimony of Robert Fischer, detailing how he and Annerino were once associates, but later had a falling out. Subsequently, someone attempted to shoot Fischer, someone threw a brick through his window

that was followed by a threatening telephone call, and someone claiming to be a Chicago police officer telephoned to tell Fischer to be home at a certain time so that a warrant could be served upon him. These incidents prompted Fischer to contact the Prospect Heights police.

The case was referred to Officer Ridges, who spoke with Fischer at Fischer's home for about 10 minutes at approximately 9 a.m. on the morning of October 17, 1985. Fischer discovered later that day that Officer Ridges was shot approximately 1½ blocks from Fischer's home.

Cook County sheriff's police officer James Lussky testified that Officer Ridges transmitted a radio message at about 9:20 a.m. on the date in question requesting backup for a traffic stop at Willow Road and Route 83. En route, Officer Lussky heard a transmission indicating that an officer had been shot at that location. Upon arriving at the scene, Officer Lussky discovered Officer Ridges' body; defendant's driver's license was nearby.

Chicago police officer John Kucharski testified that he heard a police radio message at about 9:40 a.m. that a blue Cadillac was wanted in connection with the shooting. Officer Kucharski and other police personnel testified regarding the apprehension of defendant, Coulter and Jackson in a blue Cadillac on the Kennedy expressway.

Steven Calvin and Bobby Lindsey testified that they had been offered money to shoot Fischer. They also testified that they had accompanied defendant, Coulter and Jackson to Fischer's home the night before the shooting, but Fischer was not home.

Defendant testified that he first met Annerino through relatives when he was 12 years old. Defendant's uncle suggested that defendant go see Annerino in October 1985 when defendant was looking for a job. On October 13, 1985, defendant, his uncle, and Ira Jackson went to Annerino's house. After speaking to defendant's uncle, Annerino told defendant and Jackson to apply for jobs down at City Hall and then give him the serial numbers on the applications.

Defendant and Jackson followed these instructions. Annerino told them they would have jobs by the end of the week, then asked whether they could help him with a problem. Annerino told defendant and Jackson that Fischer was trying to intimidate him. Annerino told them that he would pay them to protect him from Fischer until they got their city jobs. Annerino gave Fischer's address to defendant and Jackson, then accompanied them to Fischer's house. Annerino asked defendant and Jackson to beat up Fischer; they agreed and returned to Chicago.

According to defendant, he, Jackson, Coulter and Lindsey drove from Chicago to Fischer's house to beat up Fischer the next day, but Fischer was not home. The following day, these four men and Calvin went to Fischer's house, but Fischer was not home again. On the third day, defendant, Coulter and Jackson returned to Fischer's house. However, defendant saw a police car and drove past the house. Defendant testified that he told the others, "we're out of here, we're not going to do anything." They were stopped by the police two blocks from Fischer's house.

Defendant testified that a police officer asked for his license and asked him to step out of the car; defendant complied with these requests. Defendant was patted down with his hands on the trunk of the car. The police officer asked Jackson to step out of the car and to provide identification; Jackson did not have any identification.

The police officer then asked Coulter to step out of the car and to provide identification. When Coulter got out of the car, the officer asked whether Coulter was an officer. According to defendant, Coulter responded, "What does it look like?" Defendant testified that the police officer asked Coulter for papers to carry a weapon. Coulter asked, "Don't you trust me?" Defendant testified that Coulter then shot at the police officer. Coulter fired a second shot that hit defendant in the leg. Defendant testified that he grabbed his leg and said "Oh God, what did you do that for?" According to defendant, Coulter ordered him and Jackson to get into their car and ordered defendant to drive or be killed. Defendant drove until he was stopped by the police. Falls testified that he did not tell the police the truth about what happened due to fear.

On cross-examination, the State showed defendant an exhibit that defendant admitted had been in a drawer in his home. The exhibit indicated the address of the bar where Fischer had been working. Defendant also admitted that he had possessed papers taken from Coulter indicating Fischer's address and Annerino's address. The State asked defendant whether he believed in guns. When defendant stated that he did not, the State asked defendant about shotgun shells found in his home. The State also asked whether defendant had handcuffs in his home. When defendant stated that he did not, the State asked about handcuffs found in his home. Defendant stated that the shells and handcuffs did not belong to him and noted that he lived with his family.

Assistant State's Attorney Richard Stock testified regarding statements defendant made at Northwest Hospital and the Maybrook police station. Stock indicated that the handwritten statement taken

at the police station was similar to defendant's prior oral statements. The handwritten statement was then read to the jury. This statement recounts the shooting, but indicates that defendant, Coulter and Jackson were driving to shopping malls looking for jobs when they were stopped by Officer Ridges.

Following closing arguments and jury deliberations, defendant was found guilty of the murder of Michael Ridges and conspiracy to murder Robert Fischer. Although the trial court found defendant eligible for a death sentence, defendant was sentenced to 40 years of imprisonment. Defendant now appeals.

## I

■ The State notes in its brief that defendant has failed to include his post-trial motion in the record on appeal. Defendant is required to raise any objections he may have both at trial and in a post-trial motion or risk waiver of those objections. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) Doubts arising from an incomplete record must be resolved against defendant, as it is his responsibility to provide a sufficient record for review. (*People v. Hefley* (1982), 109 Ill. App. 3d 74, 76, 440 N.E.2d 173, 176.) The failure to include the post-trial motion in the record may therefore result in waiver of all claims required to be presented therein. (*Cf. People v. Williams* (1967), 84 Ill. App. 2d 1, 5, 228 N.E.2d 501, 504 (denial of post-trial motion not before court where it is not included in record on appeal).) Consequently, this court may limit review to: (1) constitutional issues raised at trial that may be raised in a post-conviction petition; (2) sufficiency of the evidence; and (3) plain error. (See *People v. Johnson* (1991), 214 Ill. App. 3d 1087, 1090, 574 N.E.2d 225, 226.) We turn to each of defendant's arguments in this context.

## II

Defendant contends that the trial court erred in denying his motion to suppress. Defendant claims that his statements were involuntary. Whether a statement is made voluntarily is judged by the totality of the circumstances. (See *People v. House* (1990), 141 Ill. 2d 323, 376, 566 N.E.2d 259, 282-83.) The trial court determines whether the statement was voluntary by a preponderance of the evidence; such a finding will not be reversed unless it is against the manifest weight of the evidence. (*House*, 141 Ill. 2d at 376, 566 N.E.2d at 283.) As the trial court resolved the conflicting testimony against defendant, this court will analyze the issue using the testimony of the State's wit-

nesses and the uncontroverted testimony of defendant's witnesses. See *House*, 141 Ill. 2d at 370, 566 N.E.2d at 280.

## A

■ Defendant first argues that the police questioning at the hospital resulted in a statement that was not the product of free and rational choice. The cases relied upon by defendant do not compel reversal of the trial court's ruling. In *Mincey v. Arizona* (1978), 437 U.S. 385, 401, 57 L. Ed. 2d 290, 306, 98 S. Ct. 2408, 2418, the record showed that a statement was taken at the hospital while the defendant did not want to answer police questions and "was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious." The record in this case indicates that defendant never complained of pain. The record also indicates that defendant was informed of his *Miranda* rights, but did not exercise them.

Defendant also relies upon *People v. Strickland* (1989), 129 Ill. 2d 550, 544 N.E.2d 758, in which our supreme court affirmed the suppression of statements where defendant was held for many hours without treatment and may have believed that treatment would be withheld until he gave a statement. In contrast, the record here shows that defendant was taken to the hospital immediately and was given treatment for his injury.

In sum, *Mincey* and *Strickland* are factually distinguishable from this case and do not warrant reversal of the trial court.

## B

■ Defendant also claims that his written statements were obtained in violation of his constitutional rights because retained counsel was denied access to defendant during his interrogation.

In order to warrant suppression of his statement pursuant to the United States Constitution, defendant must show that: (1) he knew an attorney had been retained on his behalf; (2) the attorney was present and requested access to defendant before completion of the custodial interrogation; and (3) the police refused to inform defendant of the immediate availability of his attorney. (*People v. Griggs* (1992), 152 Ill. 2d 1, 30, 604 N.E.2d 257, 270.) In this case, there is no allegation or evidence in the record that defendant knew or believed that an attorney had been retained on his behalf. In addition, the trial court evaluated the testimony of the witnesses and concluded that the police did not delay defendant's attorney from conferring with defendant. The trial court's determination expressly rests on an assessment of witness credibility that this court generally lacks authority to overturn.

Given this set of circumstances, defendant has failed to show that the trial court's denial of the motion to suppress was against the manifest weight of the evidence or requires a remand pursuant to *Griggs*.

Defendant argues that if a suspect's family hires an attorney for him while he is in custody and the police deny access to him and later obtain statements from him, it violates his right against self-incrimination afforded by article I, section 10, of the Illinois Constitution of 1970. (See *People v. McCauley* (1992), 228 Ill. App. 3d 893, 896-99, 595 N.E.2d 583, 585-86, *appeal granted* (1992), 146 Ill. 2d 643, 602 N.E.2d 467. But see *People v. Holland* (1992), 121 Ill. 2d 136, 152-53, 520 N.E.2d 270, 277, *aff'd on other grounds* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803.) We note that *McCauley* is easily distinguishable on its facts. Moreover, the trial court here ruled that the police did not deny or delay access to defendant. Defendant has not shown that this finding was against the manifest weight of the evidence.

## III

Defendant next contends that the trial court erred in denying his motion to sever the murder and conspiracy charges. The decision to sever charges rests within the discretion of the trial court. (*People v. Mays* (1988), 176 Ill. App. 3d 1027, 1037, 532 N.E.2d 843, 849.) This court has held in both *Jackson* and *Coulter* that the trial court did not abuse its discretion when addressing the same basic facts presented here. (*Jackson*, 233 Ill. App. 3d at 1099, 599 N.E.2d at 1199; *Coulter*, 230 Ill. App. 3d at 216-17, 594 N.E.2d at 1168.) Defendant relies primarily upon cases already distinguished in *Jackson* and *Coulter*; the additional authorities defendant cites are similarly distinguishable upon their facts. Accordingly, defendant has failed to show that the trial court abused its discretion here.

## IV

Defendant contends that the State failed to prove him accountable for the murder of Officer Ridges. The standard on appeal is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.) Determinations of the credibility of witnesses and the weight to be given to their testimony are the function of the trier of fact. This court will not disturb a guilty verdict unless the evidence is so improbable or unsatisfactory

that it raises a reasonable doubt as to defendant's guilt. *People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.

Defendant correctly notes that his mere presence at the scene of the crime does not render him accountable, even when coupled with his flight from the scene or knowledge that a crime was being committed. (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190.) However, the accountability statute incorporates the "common design rule," which provides that where two or more people engage in a common criminal design or agreement and a death occurs in the prosecution of the common object, all of the persons are guilty of the homicide. See *People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, 749.

■ On appeal, defendant does not argue that the State failed to prove him guilty of conspiring to murder Robert Fischer. The jury may have found that Officer Ridges was murdered in the course of that conspiracy. Defendant testified that at the time the police car was following him down the street, he had decided not to return to Fischer's home. However, where the defendant's testimony allegedly is the sole evidence of what occurred, the jury is not obligated to accept all or any part of that testimony, but may assess the probabilities, the reasonableness of any defense offered and reject any or all of defendant's account in favor of the State's circumstantial evidence of guilt. (*People v. Boone* (1987), 152 Ill. App. 3d 831, 835, 504 N.E.2d 1271, 1274.) In sum, a reasonable jury could decide to reject defendant's testimony on this point and find defendant accountable for the murder of Officer Ridges.

## V

Finally, defendant argues that he was denied a fair trial because the State asked questions about Annerino's death and about shotgun shells and handcuffs found in his home. Defendant cites cases including *People v. Valdery* (1978), 65 Ill. App. 3d 375, 378-79, 381 N.E.2d 1217, 1220, to argue that the State improperly suggested that he was involved in crimes other than those on trial.

As to the question regarding Annerino's death, the record shows that the State asked Fischer on redirect examination whether he knew the person who murdered John Annerino was in the courtroom. The trial court twice instructed the jury that no one in the courtroom had anything to do with the murder of John Annerino.

■ This record shows that the State's question did not directly suggest that defendant murdered Annerino. Assuming *arguendo* that the question indirectly implied that defendant murdered Annerino, the

record shows that the trial court cured any error which may have occurred. (See *People v. Cisewski* (1987), 118 Ill. 2d 163, 178, 514 N.E.2d 970, 976.) The other cases relied upon by defendant are factually distinguishable. Given the record on appeal, defendant has failed to show that the questions about Annerino denied him a fair trial.

As for the questions about shotgun shells and handcuffs discovered in defendant's home, the record indicates that defendant did not object to these questions at trial. Thus, defendant has waived the objection.

Moreover, defendant has not shown plain error in this regard. Assuming *arguendo* that the introduction of the shotgun shells or handcuffs was improper, we note that the improper introduction of evidence of bad character or possible involvement in other crimes will not warrant reversal where the record absent the improper evidence supports the conclusion that defendant received a fair trial. (See *People v. Easley* (1992), 148 Ill. 2d 281, 330, 592 N.E.2d 1036, 1058.) The record in this case contains ample evidence to support that conclusion.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.