2022 IL App (1st) 200046-U

Nos. 1-20-0046 and 1-21-0401 (cons.)

Order filed December 21, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos.  14 CR 17114 |
| | ) |     14 CR 17113 |
| COREY STEWART, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Mary Margaret Brosnahan, |
| | ) | Judge, presiding. |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice McBride and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in granting the State's motion for joinder when the two offenses occurred within three hours, less than two miles apart, and involved the same offenders and similar demands for property.

¶ 2    Following a jury trial, defendant Corey Stewart was found guilty of two counts of home invasion in case number 14 CR 17113 and one count of robbery in case number 14 CR 17114.[1] The trial court merged the home invasion counts and imposed one 25-year term of incarceration for home invasion consecutive to a 5-year term for robbery. On appeal, defendant contends that the trial court abused its discretion in granting the State's motion to join the two cases when the offenses were "distinct crimes" which occurred in different locations with different victims and motivations. We affirm.

¶ 3    In case number 14 CR 17113, defendant was charged by indictment with attempted first degree murder, aggravated battery, home invasion, attempted armed robbery, and aggravated unlawful restraint following an August 27, 2014, incident involving Jason Scott and Crystal Anderson.

¶ 4    In case number 14 CR 17114, defendant was charged with armed robbery, vehicular invasion, and aggravated unlawful restraint following an August 27, 2014, incident involving Terrence Marshall.

¶ 5    On May 25, 2017, the State filed a motion for joinder. Regarding case number 14 CR 17113, the motion alleged that defendant and Deangelo Owens entered Anderson's and Scott's home around 7:45 p.m. on August 27, 2014, demanded money, and engaged in an altercation that resulted in Owens shooting Scott. In case number 14 CR 17114, the motion claimed that defendant and Owens approached Marshall, who was sitting in his vehicle, around 10:11 p.m. that same

_____

[1] Deangelo Owens, who was also charged in both cases, was tried in a separate simultaneous jury trial and is not a party to this appeal.

night. Owens told Marshall to exit, Owens and defendant took currency and a cell phone, and Owens shot a firearm in the air.

¶ 6 Anderson later flagged a police officer and stated that the person who shot Scott was in a liquor store. The officer did not locate Owens but, as he discussed the matter with Anderson, Marshall approached and stated that the men Anderson described matched the description of the men who just robbed him. The State therefore concluded that joinder was proper as the offenses involved the same offenders and a common scheme, evidence, and witnesses.

¶ 7 On August 29, 2017, the trial court heard argument on the motion. The State argued that the two offenses occurred on the same date less than two miles apart. The offenses also occurred hours apart and, in each offense, defendant and Owens, armed with a firearm, approached the victims and sought money. In both cases, defendant and Owens fled and the firearm was fired. The State further argued the police learned defendant's and Owens's identities because as Anderson described the people who entered her home to a police officer, Marshall overheard and stated that the description "sound[ed]" like the same people who robbed him.

¶ 8 Trial counsel responded that the offenses were "unrelated." The first was either a home invasion or a "misunderstanding" between Anderson, Owens, and defendant, where the motive was "really unclear" and nothing was taken. The second was "completely different," *i.e.*, "a classic robbery." Counsel concluded that including both offenses in a single trial would prejudice defendant.

¶ 9 In response, the State noted that in case number 14 CR 17113, defendant was charged with attempted armed robbery. The State further argued that the two incidents occurred in a "short time span" and involved demands for money, the discharge of a firearm, and flight.

¶ 10    On August 31, 2017, the trial court granted the motion for joinder, finding the two offenses occurred on the same day a "few hours" apart. The court also noted a "huge confluence" of evidence relating to the identification of the offenders. As the victim in one case described the offenders, the second victim approached and likewise identified the offenders. Additionally, the offenses "arguably" shared a common method in that both involved a firearm and were attempted or successful robberies. While it was not "clear-cut" whether similar evidence would establish the same elements of each offense, as there were different victims and the offenses did not occur simultaneously, joinder was proper considering all the factors and that defendant and Owens were charged in both cases.

¶ 11    The State proceeded to trial on one count of attempted murder and two counts of home invasion in case number 14 CR 17113, and one count of armed robbery in case number 14 CR 17114.

¶ 12    Melissa Vazquez, Anderson's and Scott's neighbor, testified that her home had a video surveillance system located in the front and back of the building. Footage from August 27, 2014, was admitted and published, and is included in the record on appeal. This court has viewed the footage.

¶ 13    The front camera footage depicts a street and sidewalk. At 7:59 p.m. per the timestamp, two men approach a fence, enter a gate, and ascend the porch stairs. One man wears a white t-shirt, and one wears a blue t-shirt. The men stand on the porch, and then leave the frame at 8:00 p.m., presumably entering the building. At 8:02 p.m., the men run down the stairs, exit the gate, and flee in the direction from which they approached. At 8:11 p.m., police vehicles and a fire truck arrive.

¶ 14    The back camera footage depicts a backyard and parked cars. At 8:02 p.m. per the timestamp, a man runs through a backyard. He stands between two vehicles, looks back, waves, enters the alley, and then runs away.

¶ 15    Scott testified that in 2014, he lived with Anderson and her children in the 1300 block of South Kolin Avenue. Around 7:45 p.m. on August 27, 2014, the doorbell rang. When Scott answered the door, two men, whom he identified at trial as defendant and Owens, were there. Owens asked to speak to Anderson, so Scott went upstairs to get her. He did not invite defendant and Owens inside. When Scott told Anderson that men were there to see her, she looked out of the door and screamed, "get out of the house." When Scott turned, defendant and Owens were behind him. Anderson pushed defendant and Owens, who grabbed Scott's wrist and said, "give it up." Owens told Scott to "stop fighting" and that he would have his "partner" shoot Scott.

¶ 16    At this point, Scott grabbed Owens by the throat and saw Anderson fighting with defendant, who held a chrome ".45." Scott threw Owens into defendant and Anderson, and ran downstairs. Scott heard Owens ask for the firearm, heard a gunshot, and continued to run. Scott heard "commotion," and saw a child trying to exit the house through a window. He heard another gunshot and ran. Scott suffered gunshot wounds to the right leg and right arm.

¶ 17    Scott later identified defendant and Owens in photographic arrays. At trial, Scott viewed the surveillance footage and identified himself, defendant, and Owens.

¶ 18    Anderson testified that she was in an upstairs bedroom with her children when Scott entered and told her someone was at the door. Two men were behind Scott. Anderson knew one as "Dee" from the neighborhood. At trial, she identified Owens as Dee and defendant as the other man. Anderson told Owens to get the "hell out." Owens grabbed Scott and asked, "where the stuff

at" or "where some money at," and the men fought. Owens then told defendant to shoot Scott. Defendant drew a firearm, and Anderson and defendant "tussl[ed]." Scott then pushed everyone and ran downstairs. Defendant handed Owens the firearm, and Owens fired at Scott. Defendant and Owens then followed Scott. Anderson locked the bedroom door and pushed an air conditioner out of the window so that her children could exit. By this point, Scott was in the alley and yelled to Anderson to call the police. As Anderson looked for her phone, she heard additional gunshots. At trial, Anderson identified defendant and Owens on the surveillance video.

¶ 19    After speaking to police at a hospital, Anderson went "out west" to look for Owens and defendant. From her vehicle, she observed Owens enter a liquor store at Gladys Avenue and Cicero Avenue. Anderson flagged a police officer, described Owens and defendant, and left. She later identified defendant in a photographic array.

¶ 20    During cross-examination, Anderson testified that she met Owens in the area where he sold drugs, that her cousin gave Owens her phone number, and Owens helped her move into her home. She told police that she knew Owens from a pool hall. She had not met defendant prior to August 27, 2014, but had probably seen him.

¶ 21    Chicago police sergeant Ray Piwnicki testified that Anderson described the offenders as two African-American men, one wearing a white t-shirt and one wearing a black t-shirt.[2] She identified the man in the white shirt as Dee and provided his phone number.

¶ 22    Deonte George testified that 8 p.m. on August 27, 2014, he was in an alley, heard yelling and gunshots, and saw two men running toward him. One, whom George knew as "De," held a chrome pistol. George identified Owens in court as "De."

_____

[2] Sergeant Piwnicki testified that he held the rank of detective on the date of the offenses.

¶ 23 The parties entered a stipulation to the foundation for surveillance footage from early morning on August 28, 2014, from a liquor store. This footage was admitted and published, and is included in the record on appeal. This court has viewed the footage, which is from several cameras and depicts the interior and exterior of the liquor store.

¶ 24 One exterior clip depicts a police vehicle turning and a man in a white t-shirt running away. An officer approaches and stands in the doorway as two men exit. Additional police vehicles then arrive.

¶ 25 The interior clip depicts a vestibule where a man in a blue t-shirt shows cash to other customers and makes a purchase. He holds several paper bags and gives something to a woman. Through the open door, a police vehicle is visible. The man in the blue t-shirt makes additional purchases and then exits as a police officer enters.

¶ 26 Another exterior clip, in black and white, depicts a view of the corner of the building. A police officer crosses the street and enters the building. A man with a bag exits the building and enters a vehicle. Another squad car arrives, and a police officer speaks to a woman and then walks away. The man then exits the vehicle and walks out of the frame.

¶ 27 Chicago police sergeant Thomas Losik testified that shortly after midnight on August 28, 2014, Anderson "frantically" waved him down and stated that a man who earlier kicked in her door and shot her fiancé was in a certain store. She described the offender as an African-American man with a dreadlock hairstyle wearing a black hat and white t-shirt. Losik radioed for assistance and entered the store. No one matching the description was inside, and Losik returned to his vehicle. Anderson then repeated her description of the offender and his outfit, and described his companion as wearing a blue t-shirt and grey pants. As they spoke, Marshall approached and joined

the conversation. After speaking with Marshall, Losik looked for two men involved in an armed robbery, one wearing a blue t-shirt and the other, with a dreadlock hairstyle, wearing a white t-shirt. These men were "similar" to the men described by Anderson.

¶ 28    Losik then communicated the descriptions, reentered the store, and viewed footage depicting two men who matched Anderson's description. One, wearing a blue t-shirt, "wav[ed] money around" and purchased alcohol. Losik then sent out a third flash message with "accurate" descriptions and later learned that someone was arrested. He identified defendant in court as the man in the blue t-shirt. The surveillance video was then played. Losik identified defendant, Owens, and himself in the footage. He described defendant as the person wearing the blue t-shirt and grey sweatpants, and holding a "large sum" of money.

¶ 29    During cross-examination, Losik acknowledged that the footage depicted defendant walking by Losik as Losik entered the store. The footage also depicted defendant entering and exiting a vehicle approximately 10 yards from Marshall. Losik testified that both Anderson and Marshall were looking at Losik at that time.

¶ 30    Marshall testified that on August 27, 2014, he had approximately $2700 in his vehicle console and an additional $60 to $70 in his pocket. The money in the console was sequential $100 bills that he had withdrawn that morning.

¶ 31    Around 10 p.m., he stopped his vehicle in the 4800 block of West Harrison Street to speak to an employee on the phone. The windows were down and a man wearing a white t-shirt approached and said, "you know what this is." Marshall relayed his location to his employee. Then, he was "ushered" out of the vehicle, and a second man, wearing a blue t-shirt, patted him down. One of the men emptied Marshall's pockets; Marshall did not remember which man did this.

Marshall's phone was also taken. The first man told Marshall to enter the back of the vehicle, but he refused. The man in the blue t-shirt went through the vehicle. Marshall's employees then arrived, and the two men fled. Marshall also heard gunshots. He immediately spoke to police and stated that money was taken from his pockets. He subsequently discovered the $2700 was also missing.

¶ 32    Later, at his business, Marshall saw police activity, walked over, and heard someone report being robbed and that the offenders were nearby. Marshall told an officer that he was also robbed, and had discovered that more money was taken than he originally thought. He later went to a police station and identified both men who robbed him in photographic arrays.

¶ 33    In court, when asked if he saw the people who approached his vehicle, Marshall responded, "it's not all the way clear that it's the same guys but similar." He then stated that he saw the men he believed were in the white and blue t-shirts, and identified defendant and Owens. He acknowledged that the men in court "looked different," but asserted they "vaguely" resembled the photographs. Defendant resembled the person he identified in the photographic array as the man wearing a blue t-shirt.

¶ 34    Chicago police detective Daniel Jensen testified that on the morning of August 28, 2014, Marshall identified defendant and Owens in photographic arrays. Specifically, Marshall identified defendant as the person who removed money from Marshall's pockets and searched the vehicle. At trial, Jensen identified defendant and Owens as the people depicted in the arrays.

¶ 35    Chicago police sergeant Kenneth Fowler testified that while en route to assist Losik, he observed a man wearing a blue t-shirt and grey pants running away from "police activity." The man "kept" turning back, so Fowler and fellow officers followed him. At trial, he identified

defendant as this man. The officers spoke to defendant after he jumped a fence. Defendant stated that he threw "weed" over the fence. Officers did not find the "weed," but recovered a knife from defendant, and arrested him. During a subsequent custodial search, a "large" amount of sequential $100 bills was recovered.

¶ 36    At the close of the State's case, defendant moved for a directed verdict as to the armed robbery charge because Marshall's testimony contained "no evidence" of a weapon. The State conceded, and the trial court agreed, that the jury should be instructed as to robbery rather than armed robbery.

¶ 37    In closing argument, the State asserted that defendant and Owens "set out on a crime spree," and took advantage of an open door and window. In response, defendant argued "something" was "going on" between Anderson and Owens that defendant knew nothing about, and that things "got out of control" after Anderson told Owens and defendant to leave.

¶ 38    In case number 14 CR 17113, the jury found defendant not guilty of attempted first degree murder and guilty of two counts of home invasion. In case number 14 CR 17114, the jury found defendant guilty of robbery.

¶ 39    Defendant filed a motion for a new trial alleging, relevant here, that the trial court improperly granted the motion for joinder. The trial court denied the motion, merged the home invasion counts in case number 14 CR 17113, and imposed a 25-year sentence. In case number 14 CR 17114, the trial court imposed a consecutive five-year sentence for robbery. In case number 14 CR 17113, defendant filed a motion in arrest of judgment and a motion to reduce sentence, which were both denied.

¶ 40    Defendant filed separate notices of appeal in case numbers 14 CR 17113 and 14 CR 17114, which were assigned appeal numbers 1-21-0401 and 1-20-0046, respectively. This court consolidated the appeals.

¶ 41    On appeal, defendant contends that the trial court abused its discretion by granting the State's motion for joinder when the charges included "distinct crimes" which occurred in separate locations, with different victims and different motives.

¶ 42    A trial court may order two or more charges to be tried together if the offenses could have been joined in a single charge, unless joinder would prejudice the defendant or the State. 725 ILCS 5/114-7, 114-8 (West 2014). Offenses may be joined in a single charge, with separate counts, if they are based on two or more acts which are part of the same comprehensive transaction. 725 ILCS 5/111-4(a) (West 2014); *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 38. Whether a defendant's acts were part of the same comprehensive transaction is determined by the facts of each case. *People v. Jackson*, 233 Ill. App. 3d 1089, 1098 (1992).

¶ 43    When determining whether offenses are part of the same comprehensive transaction, we consider factors set forth in *Jackson*. See *id.* Factors to consider include "the proximity of time and location of the various charges; the identity of evidence which would be presented to prove each charge; whether the offenses shared a common method; and whether the same or similar evidence would establish the elements of the offenses." *Id.*; see also *People v. Quiroz*, 257 Ill. App. 3d 576, 586 (1993). An additional consideration is whether there was a common method in the offenses, so that each offense supplies a piece of a larger endeavor of which the crime charged is only a portion. See *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 72.

¶ 44 The trial court has broad discretion to join or sever separate charges, and we review that decision for an abuse of discretion. *Fleming*, 2014 IL App (1st) 113004, ¶ 38. The trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 45 Applying the factors discussed in *Jackson* to the case at bar, the trial court did not act unreasonably in granting the motion for joinder when the two offenses were sufficiently related in location, time, motive, method, and common evidence.

¶ 46 The " 'most important factors' " when determining whether offenses are part of a comprehensive transaction are their proximity in time and location and whether there is common evidence of the two offenses. *Fleming*, 2014 IL App (1st) 113004, ¶ 41 (quoting *People v. Harmon*, 194 Ill. App. 3d 135, 139-40 (1990)). Here, the proximity of time and location support joinder.

¶ 47 The record reveals that the home invasion of Anderson and Scott occurred within three hours of the robbery of Marshall. Additionally, the State relies on "Google Maps" to demonstrate that the locations of the home invasion and the robbery were less than 1½ miles apart, and asks this court to take judicial notice of the distance between them. We do so. [3] In the case at bar, the short timeframe and small geographic area weighed strongly in favor of joinder. See *Quiroz*, 257 Ill. App. 3d at 586 (when a shooting and an armed robbery occurred within an hour and two blocks of one another joinder was not an abuse of discretion); *People v. Reynolds*, 116 Ill. App. 3d 328, 335 (1983) (two separate robberies that occurred within minutes and also 1½ miles of one another,

---

[3] We take judicial notice that, according to Google maps, Anderson's and Scott's home in the 1300 block of South Kolin is approximately 1.2 miles from the 4800 block of West Harrison where Marshall was robbed. See *People v. Clark*, 406 Ill. App. 3d 622, 632-34 (2010) (taking judicial notice of the geographic details in a "Google Map" of an area surrounding a certain intersection and noting that "case law supports the proposition that information acquired from mainstream Internet sites such as Map Quest and Google Maps is reliable enough to support a request for judicial notice").

supported joinder). The fact that the offenses did not occur in immediate succession does not automatically eliminate the two acts from the category of a comprehensive transaction. See *People v. White*, 129 Ill. App. 3d 308, 315-18 (1984) (a burglary that occurred seven months after one theft and two months after another theft was part of same comprehensive transaction for joinder when all three offenses occurred at the same location); but see *People v. Walston*, 386 Ill. App. 3d 598, 603 (2008) (as events become separated by time and distance, the likelihood decreases that they are part of the same comprehensive transaction).

¶ 48     The second factor, common evidence, "asks not whether evidence of the two crimes is similar or *identical* but rather whether the court can *identify* evidence linking the crimes." (Emphases in original.) *Id.* at 605. Here, even if the two cases were not joined, the jury would have heard evidence relating to both the home invasion and the robbery. In both cases, defendant and Owens were identified by the victims as African-American males wearing a white t-shirt and a blue t-shirt, who appeared and departed together. Moreover, the process of identifying the offenders in Marshall's case was due to Anderson describing the offenders in her case as well as identifying Owens as Dee from the neighborhood. In other words, Marshall approached the police because he overheard Anderson's description of the offenders which matched that of the men who robbed him. Due to Anderson's description of the offenders, Losik viewed the liquor store surveillance video, which depicted defendant wearing a blue t-shirt and holding currency. There was, therefore, identifiable evidence linking the two offenses.

¶ 49     As to the third factor, whether offenses share a common method depends on whether they "were part of a 'common scheme,' so that each *** supplies a piece of a larger criminal endeavor." *Id.* at 606-07. Here, given the proximity in time and geographic location, the trial court could have

reasonably concluded, for the purposes of joinder, that defendant and Owens were engaged in a robbery spree in which they attempted to obtain valuables in a relatively small geographic area. This factor also weighed strongly in favor of joinder.

¶ 50    We are unpersuaded by defendant's argument that there was no common method because Anderson and Owens had a "personal connection" and nothing was taken from her home, whereas the Marshall encounter was "random." As noted, Anderson admitted that she knew Owens from the neighborhood and, in that case, Owens and defendant were charged with attempted robbery. However, we decline to infer a personal motivation, as that is unsupported by the record. The mere fact that Anderson and Scott fought back, presumably preventing a robbery, does not negate the fact that Owens demanded "stuff" and money when he grabbed Scott.

¶ 51    Finally, the fourth factor considers whether the same or similar evidence would establish the elements of the offenses. Here, although the offenses did not share eyewitnesses, Losik's testimony would establish the process of identifying defendant and Owens as the offenders in the robbery was due to a conversation between Anderson and Losik regarding the offenders in the home invasion. The trial court noted that this factor did not weigh strongly in favor of joinder, but concluded that the factors, in their entirety, warranted joinder. Based on the facts of this case, we cannot say that the trial court's conclusion that the factors weighed in favor of joinder was an abuse of discretion. See *Fleming*, 2014 IL App (1st) 113004, ¶ 38.

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.